BARNES, J.,
for the Court.
¶ 1. G.B.W. (“Greg”)[1] appeals the Hinds County Chancery Court’s grant of divorce on the ground of habitual cruel and inhuman treatment and denial of his claim for separate maintenance. Finding no error, we affirm.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Greg and E.R.W. (“Emma”) were married in Georgia on June 17, 1995. No children were born of the marriage. Prior to the marriage, Greg worked as a computer systems engineer at Zenith Data. A week before their wedding, however, Greg was laid off. Greg worked at a sales job until the couple moved to Annapolis, Maryland in August 1996. Emma was employed as a customer service manager with U.S. Internetworking; Greg stayed at home trading stocks on the Internet. When Emma sold her home in Georgia, Greg used the $30,000 in proceeds, along with his contribution of approximately $20,000 from the sale of a car and boat, to invest in order to create a retirement “nest egg.”[2] At one point, the couple had earned as much as $772,000 in their market account. Emma’s income covered all of the couple’s living expenses; Greg did not assist Emma with daily chores or living expenses. Greg continued to trade stocks for approximately five years. However, due to stock market problems in 2000, Greg lost all their earnings in the market account. The couple owed taxes for capital gains in 1999, totaling $140,000. Emma paid the taxes from her employment bonuses, stock market withdrawals, and $43,000 from a home equity loan. After the stock market crash, Greg started a marine electronic repair business, which was a sole proprietorship. However, there is no record of any income derived from this venture, except for testimony that Greg restored and sold a sailboat in 2000.
¶ 3. It was during this period of the marriage that Emma realized Greg was using marijuana, which he continued to do throughout their marriage. The marriage was also strained due to Emma’s desire for Greg to obtain steady employment. It was this issue that precipitated an argument between the couple while attending Emma’s family reunion in North Carolina. Greg became so angry that he took their car and returned to Maryland, leaving *1203 Emma in North Carolina without transportation and forcing her to rent a car to get home. Greg would also frequently be absent from the home, either visiting his family in Columbus, Mississippi or sailing on his boat.
¶ 4. The couple moved to Mississippi in 2001 when Emma accepted a position with a local company. Problems persisted within the marriage. In 2004, the couple attended joint and individual counseling at the Good Samaritan Center. According to the counselor, Emma was depressed, anxious, and fearful of Greg due to his possessiveness and jealousy. The main concerns were that Greg had demanded that Emma no longer associate with her long-time best friend and that Emma also wanted to have children, but Greg claimed that they had agreed not to have children.
¶ 5. Greg and Emma separated on August 30, 2005, with Greg moving to Columbus. The couple exchanged frequent phone calls for a couple of weeks, but Greg eventually asked Emma to quit calling him. In early November, while Emma was out of town on business, Greg came to the home to retrieve some personal items. Emma, in the meantime, had contacted an attorney to begin divorce proceedings. Emma changed the locks on November 23, 2005, based on her fear of what Greg would do once he was served with the no-fault divorce papers.[3] That same evening, while Emma was sleeping at their home, Greg drove to the house arriving at midnight and let himself in the house through a window which he had unlocked during his visit earlier that month. When Emma tried to leave the house, Greg restrained her. As she tried to put her shoes on, the couple struggled, and Greg fell on top of Emma and put his fist to her throat, causing her to fear for her life. Emma sustained bruises in the altercation.
¶ 6. On December 5, 2005, both parties filed a joint complaint for divorce based on irreconcilable differences. Two days later, Greg came to the house to retrieve some of his belongings. When Emma arrived home later that evening, she found the house disheveled, belongings thrown around, and gasoline on some clothing in the center of the garage. Concerned for her safety, Emma immediately vacated the house until she could obtain a peace bond and restraining order. Following this incident, Greg followed Emma from work, contacted her co-workers, and exhibited generally threatening behavior. On January 10, 2006, Greg also sent an e-mail to her attorney containing explicit photographs of Emma performing a sexual act.[4]
*1204 ¶ 7. Greg withdrew his consent for a no-fault divorce and filed for separate maintenance on February 10, 2006.[5] Emma counterclaimed for divorce on grounds of habitual cruel and inhuman treatment and habitual drug use. The trial was held in chancery court on May 22-23, 2007. At the time of trial, Emma was forty-one years old; Greg was forty-nine. Emma was awarded a divorce on October 2, 2007, based on the ground of habitual cruel and inhuman treatment, and the chancellor denied Greg’s request for separate maintenance. The chancellor based her decision on (1) Emma’s fear of Greg, (2) a letter that Greg wrote Emma stating that he was sorry for the pain and suffering he had caused her, (3) the incident between the couple which resulted in Greg’s slamming Emma against a wall while restraining her, (4) the incident where Greg apparently poured gasoline on clothes in their garage, and (5) Emma’s emotional and mental distress due to the lack of children, her demands at work, and the fact that she was the sole breadwinner. As the chancellor granted divorce on another ground, she did not address the issue of Greg’s habitual drug use.
STANDARD OF REVIEW
¶ 8. This Court has a limited standard of review of a chancellor’s decision in domestic relation matters, reversing only in cases where “the chancellor abused his or her discretion, was manifestly in error, or applied an erroneous legal standard.” Engel v. Engel, 920 So.2d 505, 508(¶ 10) (Miss.Ct.App.2006) (citation omitted). In the case of a divorce decree, facts will be viewed “in a light most favorable to the appellee.” Bodne v. King, 835 So.2d 52, 57(¶ 16) (Miss.2003) (citing Richard v. Richard, 711 So.2d 884, 888(¶13) (Miss.1998)).
I. Whether the chancellor erred in granting Emma a divorce on the ground of habitual cruel and inhuman treatment.
¶ 9. Greg argues that there was insufficient evidence to support the chancellor’s granting of a divorce on the ground of habitual cruel and inhuman treatment. In Moses v. Moses, 879 So.2d 1043, 1047(¶ 7) (Miss.Ct.App.2004), this Court stated:
In order to establish the basis for divorce on the ground of habitual cruel and inhuman treatment the claimant should produce evidence to prove conduct that: “either endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or in the alternative, be so unnatural and infamous as to make the marriage revolting to the offending spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance.”
(Citations omitted). “Habitual cruel and inhuman treatment must be established by a preponderance of the evidence, rather than clear and convincing evidence.” Mitchell v. Mitchell, 823 So.2d 568, 570(¶ 8) (Miss.Ct.App.2002) (citation omitted). This Court has further stated that:
The chancellor must evaluate not only the conduct of the offending spouse, but also the impact of that conduct upon the other spouse. Bias v. Bias, 493 So.2d 342, 345 (Miss.1986). The negative impact upon the complaining spouse may be to their [sic] mental health, not just physical health. Rakestraw v. Rakes- *1205 traw, 717 So.2d 1284, 1288(¶ 11) (Miss. Ct.App.1998). Physical violence or threats of physical violence are not necessary to prove habitual cruel and inhuman treatment. Richard, 711 So.2d at 889(¶ 9). Acts, short of physical cruelty, “such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.” Savell v. Savell, 240 So.2d 628, 629 (Miss.1970).
Id. at 571(¶ 9). “The party alleging cruel and inhuman treatment typically must corroborate the testimony.” Shavers v. Shavers, 982 So.2d 397, 403(¶ 35) (Miss.2008) (citation omitted).
¶ 10. The chancellor found that the November 23, 2005, and December 7, 2005, incidents had “rendered the relationship unsafe for Emma.” Greg reasons that the altercations could not be the bases of Emma’s claim as they did not occur until after she had notified him that he was being served with divorce papers. While we agree that Emma did state in her counterclaim for divorce that Greg’s “continued course of cruelty” caused their separation on August 30, 2005, this does not bar the consideration of any evidence of subsequent acts. A specific act is no longer required to be “the proximate cause of a separation before a divorce may be granted on grounds [sic] of habitual cruel and inhuman treatment.” Richard, 711 So.2d at 890(¶ 23). “It is, instead, habitual or continuous behavior over a period of time, close in proximity to the separation, or continuing after a separation occurs, that may satisfy the grounds for divorce.” Id. (emphasis added). In fact, “such conduct.... done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself.” Churchill v. Churchill, 467 So.2d 948, 951 (Miss.1985) (citation omitted). In addition to the incidents on November 23 and December 7, Emma also testified that Greg would throw things or hit objects near her which made her apprehensive of possible physical violence. This fear was realized on November 23, as recognized by the chancellor in her findings. Although Greg attempts to down-play the incidents in his testimony, we find that they are evidence of the ongoing psychological manipulation exerted by Greg.[6] The testimony revealed that he crept into a window in the middle of the night when it became apparent Emma had locked him out. We have no doubt that this type of behavior was done to create fear in Emma. Greg even admitted at trial that he used a move he learned from his military training to hold Emma down and prevent her from leaving the house that night. She stated that when Greg was on top of her that night, with his fist at her throat, she felt like her life was in danger. We affirm the chancellor’s conclusions and findings of fact that the incidents “rendered the relationship unsafe for [Emma].”
¶ 11. Further, even without these two incidents, there may well have been sufficient evidence to support a finding of habitual cruel and inhuman treatment. The record reflects that Greg would regularly leave the marital home to travel to his family’s farm in Columbus, Mississippi or to go sailing on his boat. Emma stated: “I was isolated; I was lonely in our marriage.” Her father also testified that Greg “was remote ... was distant from us as *1206 possible, and he was silent.” Emma stated that she suffered from “massive stress headaches” early in the marriage due to the anxiety that she felt coming home, and she became fearful of any confrontation with Greg. Emma testified at trial:
I don’t like confrontation with [Greg] because he doesn’t fight fair. He gets in your face; he twists your words; he towers over you; he yells at you; he intimidates you; you know there’s going to be repercussions and retaliations for trying to stand up to him. It got to where I couldn’t even talk to him. I— my brain would freeze because of the fear that I had. I didn’t know what was coming next. It was — you’d walk on eggshells with him; you never knew what was going to set him off.
Greg admitted that Emma’s behavior did not “please” him, mainly due to her attention to her job and not to him. He would threaten divorce when she failed to comply with his demands. As someone who had already been through a divorce, Emma was greatly disturbed by these threats. Greg stated in a letter to Emma written early in their marriage that:
You and I both know that you by nature want to over achieve and please people and make them like you. This seems to be very important to you and yet if I am to believe this to be so ... then I have to ask myself if pleasing me were important to you then why is it that I’m not pleased? Could it be that only I’m getting 2-3 hours of your day ... and the job gets 12-14 hours of you[r] day and most of your mind share (even on the weekends).
(Emphasis added). Greg clearly played “mind games” with Emma, using her desire to please people in order to make her nervous and fearful. Her testimony explained that any lack of quality time in the marriage was due to the fact that she was the sole breadwinner and was also in charge of taking care of household duties when she came home. Emma stated:
I was to provide the income; I was to cook; I was to clean; I was to meet his sexual expectations. And I tried to voice for him what I need[ed] from him, and the confrontations, the retaliations, the isolation, the abandonment, they were there in 1997. We tried to work through them, and they just got worse.
This testimony is corroborated in one of Greg’s letters to Emma, dated November 22, 2004, in which he stated:
I realize now and accept that for years you have felt that I don’t really love you but only want you around to meet my needs.... By making you feel this way I have caused you to loose [sic] respect for me as well as diminished you[r] own self respect.... I realize now how my coping mechanism was flawed and, destructive not just to you but to our relationship with one another and our marriage.... I promise never again to go to bed angry or go off and leave you as a way of trying to cope with what I’m feeling or my frustrations.
(Emphasis added).
¶ 12. There were numerous occasions that showed Greg to be controlling over Emma’s relationships and emotionally distant when he was angry. On rare instances that Emma was allowed to go out with co-workers, she had a curfew of 9:00 p.m. She testified that eventually her friends quit asking her to go places because she was never able to go without fear of a confrontation with Greg. Emma also quit pursuing a graduate degree due to Greg’s threat of divorce if she did not quit school. Criticism and controlling behavior will “not fulfill the requirements of a divorce on the grounds [sic] of habitual cruel and inhuman treatment.” Morris v. Morris, 804 So.2d 1025, 1031(¶22) (Miss. *1207 2002). However, “habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse.” Stone v. Stone, 824 So.2d 645, 646-47(¶4) (Miss.Ct.App.2002) (quoting Holladay v. Holladay, 776 So.2d 662, 677(¶64) (Miss. 2000)). Greg habitually accused Emma of infidelity throughout the marriage, later even accusing her of having affairs with other women. “[FJalse accusations of infidelity, habitually made over a long period of time, without reasonable cause, constitute such cruelty as to warrant the granting of a divorce.” Hibner v. Hibner, 217 Miss. 611, 614, 64 So.2d 756, 757 (1953). In Greg’s deposition, he admitted that he forwarded the sexually explicit photographs to Emma’s attorney to show that she had a “proclivity” toward oral sex, which created a suspicion in his mind that she was cheating.[7] In another letter to Emma, dated October 8, 1997, Greg had stated:
You even asked, coincidentally, back in July when you argued with me about oral sex not really being sex, if I had been having you followed.... Obviously you were concerned that you might have been caught in the act and that’s why I was quizzing you about whether or not you felt oral sex was sex.... All of this has contributed to making it hard to trust you and easy for me to feel very insecure about your fidelity.
No evidence was ever presented to show that Greg’s accusations were founded.
¶ 13. Greg contends that Emma’s desire for divorce was based solely on her desire to have children. It is apparent that having a family was important to Emma. She claimed that Greg had also expressed the desire to have children at one point; however, he told her shortly after their wedding that he no longer wanted children and even threatened divorce on this issue. Emma also claims that Greg told her on one occasion that she would be an unfit mother. The counselor from Good Samaritan stated that Greg told him that Emma agreed not to have children, but the counselor also noted that Emma expressed her longing for children in their session. Emma contends that any time she expressed a longing for children, Greg would leave the house or discuss divorce. When Emma started taking fertility drugs in 2005; Greg vacated the house and never came back. Emma has not disputed the fact that she wanted children; however, that fact in no way lessens her evidence of habitual cruel and inhuman treatment on the part of Greg.
¶ 14. We conclude that it was shown by a preponderance of the evidence that Greg continually subjected Emma to demanding and manipulative behavior and accusations of infidelity, coupled with emotional isolation when she was not acting in a manner that “pleased” him. As a result, Emma suffered from “massive stress headaches.” This “course of conduct” by Greg may well have been sufficient to support the chancellor’s grant of divorce based on habitual cruel and inhuman treatment. However, when combined with the incidents on November 23, 2005, and December 7, 2005, in which Greg entered the marital home through a window in the middle of the night, used military maneuvers to restrain *1208 Emma, and left gasoline-soaked clothing in the garage for Emma to find, we have no doubt that the chancellor’s conclusions were proper.
II. Whether the chancellor erred in denying Greg’s request for separate maintenance.
¶ 15. Greg argues that his requested separate maintenance of $5,543 per month was justified based on Emma’s abandonment of their marriage and her greater earning capacity. “Separate maintenance is a court-created equitable relief based upon the marriage relationship and is a judicial command to [a spouse] ... to provide suitable maintenance of [the other spouse] until such time as they may be reconciled to each other.” Perkins v. Perkins, 787 So.2d 1256, 1262(¶ 15) (Miss.2001) (citing Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993)). The chancellor has the power to grant separate maintenance based on (a) separation without fault on the part of the spouse praying for relief, and (b) willful abandonment of the spouse requesting relief, coupled with refusal by the at-fault spouse to support the other spouse. Thompson v. Thompson, 527 So.2d 617, 621 (Miss.1988). The spouse requesting relief “is not required to be totally blameless to allow an award of separate maintenance,” but any misconduct by such spouse “must not have materially contributed to the separation.” McIntosh v. McIntosh, 977 So.2d 1257, 1268(¶40) (Miss.Ct.App.2008) (citations omitted). As we have affirmed the chancellor’s grant of divorce based on Greg’s habitual cruel and inhuman treatment of Emma, which materially contributed to their separation, Greg’s claim for separate maintenance is a moot issue. See Weiss v. Weiss, 579 So.2d 539, 541 (Miss.1991) (where a divorce has been granted, a claim for separate maintenance in “no longer proper”).
¶ 16. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.

. Due to the explicit nature of some of the facts involved in this case, pseudonyms are used to protect the identity of the appellee.

. The amount that Greg contributed was disputed by Emma who said that he only con-iributed about $7,000. Greg testified that their retirement goal was one million dollars, at which point the couple had plans to move to Columbus, Mississippi and live on his family’s farm.

. Although Greg was not served with the divorce papers until November 28, 2005, Emma informed Greg of her intention to obtain a divorce in a phone conversation on the 23rd.

. Greg’s e-mail stated:
I’ve given [my attorney] evidence that I want entered for the record. I still retain the supporting photographic evidence. You had indicated to me through Ms. Bishop what you intend to allege. This evidence is all in [Emma’s] writing and the supporting photographic evidence clearly shows her “performing.” I had not wanted to use this and I told [Emma] that I wouldn't unless she does what she is anticipating doing. These are not threats, just sharing with you as you did with me what you intend to do going forward. Please feel free to ask [my attorney] for the documents as I intend for them to be entered as a matter of record anyway.
Greg stated at trial that he thought Emma was going to make a claim of alienation of affection and the purported use of the photographs was to disprove any such claim. Emma never made any claim of alienation of affection. Despite Greg’s explanation, it appears to be fair reading of the e-mail that the threats to use the photographs of Emma were in response to her intent to raise the issue of Greg’s marijuana use.

. The motion for temporary alimony, which was contained in Greg’s complaint for separate maintenance, was denied by the chancellor on January 20, 2007.

. Greg argued that the reason gasoline may have been on the clothes was due to the fact that he was going through some containers of old clothes in the garage to see what he wanted to take and a small gas can on a baker's rack possibly got knocked over in the process.

. Although Greg maintained that the photos were taken with Emma’s consent and that she enjoyed posing for them, Emma said that it was Greg's idea and it made her uncomfortable and that she did not like it. At trial, Greg denied using the evidence to threaten Emma or disparage her in any way. Regardless, the chancellor noted that she would not use the photos "as any type of influence one way or the other as it relates to the separate maintenance or the grounds for divorce.”