# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00403-COA

WILLIAM GERALD GILMER

APPELLANT/
CROSS-APPELLEE

v.

SANDRA GIACHELLI GILMER

APPELLEE/
CROSS-APPELLANT

| | |
|---|---|
| DATE OF JUDGMENT: | 02/15/2018 |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MATTHEW THOMPSON |
| | CHAD KENNETH KING |
| ATTORNEYS FOR APPELLEE: | TRACY STIDHAM STEEN |
| | WHITNEY McKAY ADAMS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.  ON CROSS-APPEAL: AFFIRMED - 05/28/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE TINDELL, P.J., McDONALD AND McCARTY, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     On October 4, 2017, the Rankin County Chancery Court entered its opinion and final judgment, granting Sandra ("Sandy") Gilmer a divorce against William ("Bill") Gilmer on the ground of habitual cruel and inhuman treatment.  After dividing the couple's marital property, the chancellor awarded Sandy the marital home and ordered her to pay Bill $75,275 (half of the equity in the home).  The chancellor also ordered Sandy to repay any remaining balances on the marital-home mortgage and on the couple's Copiah Bank line of credit.

Finally, the chancellor denied Bill's request for separate maintenance or alimony. In his opinion, the chancellor also granted Sandy's second motion for contempt against Bill and awarded Sandy a total of $10,750 in attorney's fees for the divorce action and the contempt action.

¶2.     Following the chancellor's judgment, Bill filed a motion for new trial or amendment of judgment on October 16, 2017. On February 15, 2018, the chancellor entered an order amending his judgment and awarding Bill an additional $3,625 in equity on the couple's marital home. In the amended judgment, the chancellor also found that Bill was not required to reimburse Sandy for $2,500 in attorney's fees that the previous chancellor had ordered her to pay Bill as a sanction for her first motion for contempt.

¶3.     Aggrieved, Bill appeals from the chancellor's opinion and final judgment, challenging the judgment of divorce, distribution of marital assets and debt, denial of separate maintenance and alimony, and award of attorney's fees. Sandy cross-appeals, challenging the chancellor's division of assets in the original judgment and the chancellor's decision to require Bill to reimburse her with $2,500 in attorney's fees related to her first motion for contempt.

¶4.     Upon review, we find no error in the chancellor's judgment of divorce, equitable division of assets, or denial of separate maintenance or alimony. We also find no error in the chancellor's decision to not require Bill to repay the $2,500 to Sandy. But we do find that the chancellor erroneously granted Sandy attorney's fees without providing a proper analysis

2

regarding her ability to pay. We therefore affirm in part and reverse in part the chancellor's judgment, and we remand this case for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶5. Bill and Sandy married on June 25, 2005. The couple had no children together, but both parties had children from previous marriages. Sandy has three children (Jamie Aron, Josh Aron, and Jacob Aron), and Bill has two children (Kim Gilmer Horn and Will Gilmer). The couple exercised a "week on, week off" custody arrangement so that Bill's children and Sandy's children could all be together at the same time. Bill and Sandy lived in Florence, Mississippi, for the majority of their marriage until their separation on or about August 24, 2014.

¶6. On August 26, 2014, Sandy filed for divorce against Bill on the ground of habitual cruel and inhuman treatment. On September 9, 2014, Bill answered, denying Sandy's allegations and requesting temporary and permanent separate maintenance. That same day, the parties entered into an agreed temporary order, which allowed Bill temporary, exclusive use and control of the marital home. The order also held Bill responsible for making all payments on the home's mortgage and the couple's Copiah Bank home equity line of credit. Additionally, Sandy agreed to attend two counseling sessions with Bill at his expense. The agreed order also allowed Sandy to take possession of certain pieces of furniture and personal property.

¶7. Throughout the divorce proceedings, the parties filed various motions for contempt

3

against each other relating to their agreed temporary order. Sandy filed her first motion for contempt against Bill on October 15, 2014, arguing that Bill had willfully and maliciously failed to timely make the mortgage payments, thereby damaging Sandy's credit rating. Sandy also argued that Bill refused to allow her to have certain pieces of furniture and personal property listed in the agreed temporary order. Sandy requested that the chancellor place Bill in jail for failing to timely pay their mortgage and issue a writ of assistance to the Rankin County Sheriff's Office so that law enforcement could accompany her to the marital home to retrieve her remaining personal property. Bill filed his own motion for contempt against Sandy on October 23, 2014. In his motion, Bill argued that Sandy wrongfully prevented him from access to the couple's online Wells Fargo account, refused to attend counseling sessions as mandated by the agreed temporary order, and entered the marital home and collected items not listed in the agreed temporary order.

¶8.     On October 30, 2014, the chancellor conducted a hearing on both motions for contempt. At the conclusion of the hearing, the chancellor issued a bench ruling and primarily found Sandy's motion to be frivolous and ordered her to pay Bill $2,500 in attorney's fees as a sanction. The chancellor also appointed Gary Williams, Esq. to supervise Sandy as she retrieved the remaining items of personal property listed in the agreed temporary order. But the chancellor subsequently died, and the bench ruling was never deduced to a written order. Sandy complied with the chancellor's bench ruling, however, and paid Bill $2,500 in attorney's fees.

4

¶9.     Divorce proceedings took place before the succeeding chancellor on June 16, 2015; May 17-18, 2016; October 17-18, 2016; October 20, 2016; and March 27-28, 2017.  In the midst of the proceedings, Sandy filed her second motion for contempt on August 4, 2016.  After hearing all the evidence over a period of nineteen months, the chancellor took the divorce and property distribution matters under advisement, as well as Sandy's second motion for contempt.  On October 4, 2017, the chancellor entered his opinion and final judgment and found, in pertinent part, that: (1) Sandy was entitled to a divorce against Bill on the ground of habitual cruel and inhuman treatment; (2) Sandy was awarded exclusive possession and control of the couple's marital home and was required to pay Bill $75,275 in equity in the marital home; (3) Sandy was to be responsible for all remaining debt on the Wells Fargo mortgage and on the Copiah Bank line of credit; (4) Bill was not entitled to separate maintenance or alimony; (5) Bill was held in contempt of court and required to pay any past-due payments; and (6) Bill was required to pay Sandy $10,000 in attorney's fees for the divorce action and $750 for the second contempt action.

¶10.    Following the chancellor's opinion and final judgment, Bill filed a motion for new trial or amendment of judgment on October 16, 2017.  In his motion, Bill argued, in part, that (1) the chancellor's division of equity in the marital home failed to consider any payments Bill made during the divorce proceedings; (2) the chancellor failed to make a proper *McKee*[1] analysis to determine whether Sandy had an inability to pay her attorney's fees; and (3) Bill

---

[1] *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982).

should not be required to reimburse Sandy for the $2,500 sanction that the previous chancellor assessed against her for her first motion for contempt.

¶11. On February 15, 2018, the chancellor entered an order amending judgment. In his amended judgment, the chancellor awarded Bill an additional $3,625 in equity on the marital home. The chancellor further found that Bill was not required to reimburse Sandy for the $2,500 relating to her first motion for contempt. But the chancellor found that the $10,750 award of attorney's fees to Sandy was appropriate under *McKee*.

¶12. Bill appeals from the chancellor's opinion and final judgment, arguing that the chancellor erred when he (1) granted a divorce based upon habitual cruel and inhuman treatment, (2) equitably distributed the couple's marital property based upon the divorce, (3) declined to consider Bill's request for separate maintenance or alimony, and (4) awarded Sandy attorney's fees without making a proper *McKee* analysis regarding Sandy's ability to pay. Sandy cross-appeals the chancellor's original judgment and the amended judgment, arguing that the chancellor erroneously (1) awarded Bill an additional $3,625 in equity on the couple's marital home without sufficient evidence, (2) decided that Bill was not required to reimburse the $2,500 in attorney's fees pursuant to the previous chancellor's bench ruling, and (3) assessed the entirety of the couple's Copiah Bank line of credit to Sandy against the weight of the evidence.

## STANDARD OF REVIEW

¶13. We adhere to a limited standard of review when analyzing a chancellor's

6

determinations in domestic-relations matters. *Williams v. Williams*, 224 So. 3d 1282, 1284 (¶5) (Miss. Ct. App. 2017). "[T]his Court will not disturb a chancellor's judgment when it is supported by substantial credible evidence unless the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Branch v. Branch*, 174 So. 3d 932, 937 (¶9) (Miss. Ct. App. 2015) (citing *Rolison v. Rolison*, 105 So. 3d 1136, 1137 (¶4) (Miss. Ct. App. 2012)). But we apply a de novo review to questions of law. *Id.*

¶14. When this Court reviews issues related to a chancellor's division of marital property, we are required "to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Wells v. Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001). Because alimony is generally considered along with property distribution, we also review alimony determinations for abuse of discretion. *Myrick v. Myrick*, 186 So. 3d 429, 435 (¶29) (Miss. Ct. App. 2016). Likewise, we review decisions to grant or deny separate maintenance for abuse of discretion. *McCarley v. McCarley*, 270 So. 3d 218, 222 (¶21) (Miss. Ct. App. 2018). Finally, we review a chancellor's award of attorney's fees using an abuse-of-discretion standard, bearing in mind that chancellors are afforded broad discretion in these determinations. *Brooks v. Fields*, 134 So. 3d 786, 791 (¶19) (Miss. Ct. App. 2013).

**ANALYSIS**

I. **Whether the chancellor erroneously granted Sandy a divorce against Bill based upon habitual cruel and inhuman treatment.**

¶15. Bill first challenges the chancellor's decision to grant Sandy a divorce based upon

7

habitual cruel and inhuman treatment. Mississippi statutory law gives chancellors the authority to grant a fault-based divorce upon the ground of habitual cruel and inhuman treatment to an offended spouse who meets the necessary burden of proof. Miss. Code Ann. § 93-5-1 (Supp. 2017). To meet this burden, the offended spouse must show by a preponderance of the evidence that the offending spouse's conduct either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or
>
> (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017). But "[t]he offending spouse's conduct must exceed 'unkindness or rudeness or mere incompatibility or want of affection' and 'must be shown to have been systematic and continuous.'" *Id.* (quoting *Horn v. Horn*, 909 So. 2d 1151, 1155 (¶7) (Miss. Ct. App. 2005)). The offended spouse must establish some causal connection between the offending spouse's conduct and its impact on the offended spouse. *Id.* This subjective inquiry focuses "on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Id.*

¶16. Generally, to show a causal connection, the offended spouse must offer some corroboration for his or her testimony of the alleged cruel and inhuman treatment. *White v. White*, 208 So. 3d 587, 593 (¶13) (Miss. 2016). As of 2017, section 93-5-1 allows for corroboration in cases of spousal domestic abuse by "a single credible witness, *who may be*

8

*the injured party*[.]" 2017 Miss. Laws ch. 427, § 6 (S.B. 2680) (emphasis added). The

revised statute defines "spousal domestic abuse" as behavior including:

> That the injured party's spouse attempted to cause, or purposely, knowingly[,]
> or recklessly caused bodily injury to the injured party, or that the injured
> party's spouse attempted by physical menace to put the injured party in fear of
> imminent serious bodily harm; or

> That the injured party's spouse engaged in a pattern of behavior against the
> injured party of threats or intimidation, emotional or verbal abuse, forced
> isolation, sexual extortion or sexual abuse, or stalking or aggravated stalking
> as defined in Section 97-3-107, if the pattern of behavior rises above the level
> of unkindness or rudeness or incompatibility or want of affection.

Miss. Code Ann. § 93-5-1 (Supp. 2017).

¶17.    Bill argues that Sandy's trial evidence failed to satisfy the burden necessary to grant

a divorce based upon habitual cruel and inhuman treatment. At trial, the chancellor heard

testimony from a number of witnesses, including the parties and their children. Sandy

testified that Bill had been controlling and manipulative from the very beginning of their

nine-year marriage. Sandy stated that Bill frequently called her a "bad mother" and

controlled the way she disciplined her children. Bill also controlled Sandy's custody matters

because he thought she was "ignorant" and did not handle her custody arrangements

properly.

¶18.    Sandy also described the ways in which Bill tried to control their sexual relationship.

Bill often referenced the Bible, telling Sandy that she was required to be submissive. Sandy

also testified that Bill tried to force her to have anal sex and a threesome multiple times in

the marriage. Sandy also found pornography on Bill's computer, but Bill denied ever

9

watching it. She testified that this behavior made her feel inadequate as a wife.

¶19. Bill was also verbally and emotionally abusive to Sandy throughout their marriage. Sandy testified that he would constantly yell and belittle her by calling her stupid. She further testified that Bill habitually used profanity and would often call her derogatory names such as "bitch," "GD liar," and a "f-ing lost cause." Sandy testified that Bill also yelled at her children and called them derogatory names such as "bitch." Sandy's daughter Jamie testified that Bill verbally abused her and her brothers. Jamie stated that Bill would "apologize" by blaming his anger on her and telling her that he was mean to her to force her out of their house. After years of Bill's behavior, Sandy's children told her that they no longer wanted to come on her designated weekends. Sandy also stated that she was often afraid to come home because she never knew what would cause Bill to lose his temper.

¶20. Throughout the proceedings, Bill vehemently denied any verbal abuse, but he eventually admitted to calling Sandy derogatory names during the marriage. Sandy also introduced an audio recording into evidence that the chancellor found substantiated her claims. In his opinion, the chancellor stated:

> This audio recording, which is approximately fifteen minutes in length, *is so outrageous in nature that it shocks the conscience of this Court*. Although defense counsel characterizes this as an argument between Bill and Sandy, it consists of periods of unbridled rage from Bill, belittling and cursing Sandy. This recording clearly corroborates Sandy's claim of verbal abuse from Bill.

(Emphasis added). The chancellor also found that the testimony from Sandy's children provided further evidence that the type of verbal abuse contained on the audio recording was

10

typical of the way Bill spoke to Sandy throughout their marriage.

¶21. Sandy testified that Bill's temper also caused him to be physically violent and that "everyone had to just get out of his way" when he had these physical outbursts. During the marriage, Bill destroyed several pieces of furniture and appliances in the house out of anger. At trial, Sandy presented to the chancellor a picture of a garbage can that Bill destroyed during one of his fits of rage. Sandy stated that Bill became so angry after a fight that he took a screwdriver and began stabbing the garbage can, which "scared her to death." Sandy further testified that Bill broke two computers during this time by punching through the screens. Sandy also testified that Bill tried to hurt the family's dog on one occasion. She stated that Bill started a fight with her in front of their children. Bill became so angry that he picked up the family's dog and threw her over the children's heads onto the ground. Sandy testified that this scared her and her children so much that she wanted to take the dog to her parents' house. Sandy testified that Bill often blamed her for these acts of violence.

¶22. Sandy testified that Bill became physically abusive toward her in the months leading up to their separation. According to Sandy, Bill's physical aggression toward her began by him getting angry and throwing smaller items at her, such as utensils and eye glasses. Sandy then described two separate instances where Bill attempted to hurt her.

¶23. In June 2014, Sandy testified that Bill had been arguing with her and her son, Jacob, when Bill became physically aggressive. She stated that Bill tried to corner Jacob in their garage, but Jacob left and went to his father's house. Bill then came back into the house and

11

started yelling and cursing at Sandy. Sandy stated that she ran into their bedroom, and Bill followed her. In the bedroom, Bill pushed her onto the bed and put his hands around her neck as if to choke her. Bill eventually stopped when his son, Will, intervened. Immediately following the incident, Sandy called the Rankin County Sheriff's Department, which ordered Bill and Will to leave the house for the evening.

¶24. Sandy testified that "the final straw" occurred on August 24, 2014, the day of the parties' separation. Sandy testified that she was leaving to go to a mothers' prayer meeting in honor of her son's classmate who had just died. As Sandy was leaving, Bill became very upset and accused Sandy of lying about where she was going. Sandy testified that Bill physically grabbed her and took two sets of keys to prevent her from leaving. Bill also ordered his daughter, Kim, to use her car to block Sandy's car. Fearing for her safety, Sandy ran into the couple's home to use their remote phone. She testified that Bill followed her into their bedroom, tackled her onto the bed, and grabbed the phone. After a few minutes, Sandy ran into the backyard, hoping to escape to a neighbor's home. Bill met her outside and threw her phone and keys at her. Once Sandy tried to leave again, Bill used his truck to block the driveway. Sandy testified that this incident made her "scared to death" because she did not know what "Bill's next step would be."

¶25. After their separation, Bill's controlling and abusive behavior continued. As stated, on September 9, 2014, the parties entered an agreed temporary order allowing Sandy to procure certain personal items from the marital home. The chancellor appointed Gary

12

Williams to supervise Sandy as she collected these items. Williams testified that while he and Sandy were in the marital home, Bill started arguing with Sandy and refused to let her take her own underwear out of the house. When questioned about this incident, Bill completely denied that the incident happened, which the chancellor found to be a clear indication that Bill was lying.

¶26. Sandy also stated that Bill stalked her several times after the separation. According to Sandy, Bill would show up at ball games, parking lots, and stores without warning to confront her. Bill was eventually arrested for criminally stalking Sandy after he appeared outside a hotel where Sandy was staying and fled with the family's dog Susie. Bill pled *nolo contendre* to the stalking charges. Bill was also convicted for contempt of court after he violated a no-contact order entered on July 30, 2015.

¶27. Sandy and her children testified that her marriage to Bill affected her physical and mental health. Sandy testified that she felt like a hostage and was constantly walking on eggshells because of Bill's temper. Sandy was afraid for her own safety at times because she never knew what Bill might do to her. Sandy stated that Bill's screaming and cursing made her ears ring and caused her to have headaches. Sandy's daughter Jamie testified that she never saw her mother happy during the marriage and confirmed that her mother suffered from chronic headaches. Sandy's son, Josh, testified that Bill's behavior was scary and that he and his siblings stayed in their rooms to avoid confrontation. He further testified that Bill's behavior often prevented his mom from sleeping. Sandy's children all testified that

Sandy has been much happier since the separation and can actually sleep better at night.

¶28. On appeal, Bill asserts that Sandy failed to prove by a preponderance of the evidence that his behavior warranted a divorce based upon habitual cruel and inhuman treatment. Specifically, Bill argues that the chancellor based his findings and determinations solely upon "vague, uncorroborated, and conflated testimony" from biased witnesses and a recording of Bill taken after the marriage was over. But the chancellor acts as the trier of fact in divorce matters and "evaluates the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony." *Shavers v. Shavers*, 982 So. 2d 397, 405 (¶41) (Miss. 2008). We also reiterate that the State Legislature amended the divorce statute on July 1, 2017,[2] allowing for corroboration in cruelty-based divorces "by a single credible witness, *who may be the injured party*," in cases where spousal domestic abuse is present. Miss. Code Ann. § 93-5-1 (emphasis added).

¶29. Here, the chancellor provided a detailed analysis of the evidence and testimony before him. The chancellor noted that Bill was often flippant and evasive while testifying, and the chancellor found that Bill's testimony lacked credibility. In contrast, the chancellor found Sandy to be a credible witness based upon her conduct, demeanor, and attitude at trial. Likewise, the chancellor found credibility in the testimony from Sandy's children.

¶30. The chancellor heard testimony regarding Bill's controlling and volatile behavior and

---

[2] The chancellor granted the divorce on October 4, 2017, and entered his amended judgment on February 15, 2018. Therefore, the amended statute applies here.

14

the physical and mental toll this behavior had upon Sandy. While Bill primarily denied all of Sandy's accusations at trial, he admitted that he had called Sandy derogatory names. The chancellor also heard testimony about Bill's physically violent behavior, including his destruction of the couple's property and mistreatment of the family's dog. Sandy then described how Bill became physically abusive toward her in the months leading up to their separation, including the final instance where Bill attempted to choke her. Based upon the evidence and testimony, the chancellor found that Bill was both verbally and physically abusive to Sandy during their marriage, and he granted Sandy a divorce based upon habitual cruel and inhuman treatment.

¶31. This Court has held that "[o]nce the [chancellor] has determined that the standard of proof has been met for granting a divorce on the ground of habitual cruel and inhuman treatment, we are not at liberty to disturb those findings unless we find manifest error of law or fact." *Richardson v. Richardson*, 856 So. 2d 426, 431 (¶23) (Miss. Ct. App. 2003). Being mindful of our limited standard of review, we find that substantial evidence supports the chancellor's findings that Bill's behavior constituted habitual cruel and inhuman treatment. We therefore find no error in the chancellor's decision to grant Sandy a divorce.

## II. Whether the chancellor erred in his equitable distribution of the marital property.

¶32. Both parties take issue with the chancellor's distribution of the marital property. In his appeal, Bill argues that the chancellor's equitable distribution should be reversed in general because the judgment of divorce was erroneous. In her cross-appeal, Sandy

challenges (1) the chancellor's assessment of the couple's Copiah Bank line of credit to her, and (2) the chancellor's amended judgment that awarded Bill an additional $3,625 in equity on the marital home.

¶33.    "Mississippi law requires equitable distribution of the marital estate during divorce proceedings."  *Griner v. Griner*, 235 So. 3d 177, 184 (¶9) (Miss. Ct. App. 2017) (citing *Owen v. Owen*, 798 So. 2d 394, 399 (¶14) (Miss. 2001)).  "To equitably divide property, the chancellor must: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets."  *Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶11) (Miss. Ct. App. 2016) (citing *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994)) (other citation omitted).  Prior to division, the chancellor must apply the factors established by the Mississippi Supreme Court in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

¶34.    The *Ferguson* factors are the following:

(1) contribution to the accumulation of property;

(2) dissipation of assets;

(3) the market or emotional value of the assets subject to distribution;

(4) the value of assets not subject to distribution;

(5) the tax and economic consequences of the distribution;

(6) the extent to which property division may eliminate the need for alimony;

(7) the financial security needs of the parties; and

(8) any other factor that in equity should be considered.

16

*Id*. at 928. We will not disturb the distribution of marital property so long as the chancellor properly applies the *Ferguson* factors. *Carter v. Carter*, 98 So. 3d. 1109, 1113 (¶12) (Miss. Ct. App. 2012).

### a. Whether the chancellor erroneously divided and distributed the couple's marital property.

¶35. In his brief, Bill includes a general argument that because the divorce was erroneous and should be reversed, the chancellor erroneously proceeded in his *Ferguson* analysis and distributed the marital property. As such, Bill argues that the chancellor's equitable distribution of property is also erroneous and should be reversed. But we find no error in the chancellor's decision to grant a divorce, and as such, we find no merit to this general assertion.

### b. Whether the chancellor erroneously assessed the Copiah Bank line of credit to Sandy.

¶36. "Debts acquired during the course of the marriage are also subject to equitable distribution." *Id.* at 1114 (¶15). During the marriage, Sandy and Bill jointly incurred a home equity line of credit from Copiah Bank. At the close of trial, the line of credit had a remaining balance of $16,000. In his opinion, the chancellor awarded Sandy the marital home but assessed the home's mortgage and the line of credit to her. Sandy now argues in her cross-appeal that the assessment of the line of credit to her was against the substantial weight of the evidence.

¶37. In reviewing a chancellor's judgment, this Court only analyzes the chancellor's

17

findings in applying the *Ferguson* factors; we do not conduct the *Ferguson* analysis anew. *Id*. at 1112 (¶9). In his *Ferguson* analysis, the chancellor found the parties to be in similar financial situations leaving the marriage, both being gainfully employed and earning their own incomes. But the chancellor noted that the couple's most valuable asset, the marital home, was being awarded to Sandy, and Sandy was also leaving the marriage with a significant retirement account. In contrast, Bill was awarded equity in the marital home but had no retirement account. Therefore, the chancellor found Bill to be in slightly more of a financial need in leaving the marriage.

¶38. Sandy argues that the chancellor's assessment of this line of credit to her is "hardly equitable" because Bill wrote checks from the line of credit and primarily benefitted from the line of credit. But the record reflects that while the line of credit was originally used to pay off Bill's credit-card debt, it was later used on the marital home. Bill testified that he used the line of credit throughout the marriage and after the separation to pay home and property taxes and to pay for roofing repairs on the marital home. Further testimony revealed that the line of credit was also used during the marriage to buy Christmas presents for the parties' children. This evidence shows that Sandy also benefitted from the line of credit.

¶39. "In presiding over a divorce case, the chancellor's goal is to achieve equity." *Humphries v. Humphries*, 904 So. 2d 192, 199 (¶24) (Miss. Ct. App. 2005). We therefore give the chancellor broad inherent powers to achieve that goal. *Id*. "The matter is committed to the discretion and conscience of the chancellor, having in mind all the equities and other

18

relevant facts and circumstances." *Id*. Equitable distribution does not always mean *equal* distribution of property. *Id*. Rather, "fairness is the prevailing guideline in marital division." *Id*. (citing *Ferguson*, 639 So. 2d at 929).

¶40. Upon review, we find nothing inherently inequitable about the chancellor's assessment of the line of credit to Sandy. Bill left the marriage with a smaller estate and no retirement while Sandy left with the marital home, various personal assets, and a retirement account. Furthermore, the line of credit was used during the marriage for the parties' Christmas presents and to pay taxes and repairs on the marital home, which Sandy now exclusively owns and possesses. This evidence shows that Sandy derived some benefit from the line of credit. We therefore find that substantial evidence supports the chancellor's decision and that the chancellor did not abuse his discretion here.

### c. Whether the chancellor erroneously awarded Bill $3,625 more in equity in his amended judgment.

¶41. Sandy also challenges the chancellor's reassessment of the marital home's equity and his decision to award Bill an additional $3,625 in equity. In his original judgment, the chancellor found that the marital home had a mortgage balance of $186,25 and approximately $150,500 in equity. The chancellor awarded Sandy the marital home, but he awarded Sandy and Bill half of the approximated equity, which amounted to $75,250.

¶42. In his motion for new trial or amendment of judgment, Bill argued that the chancellor's division of equity in the marital home failed to consider the payments Bill had made on the home throughout the divorce proceedings as mandated in the couple's 2014

19

agreed temporary order. On February 15, 2018, the chancellor entered his amended judgment wherein he found that the mortgage actually had a remaining balance of $179,000 based upon the payments Bill had made during the course of the divorce proceedings. The chancellor further found that Sandy and Bill were each entitled to $78,900 in equity, rather than his original calculation of $75,275. Sandy now challenges this additional $3,625 in equity awarded to Bill.

¶43. Sandy claims that no evidence existed to support the chancellor's reassessment of equity and award of $3,625 to Bill. But both parties admit that the chancellor was provided with numerous exhibits, as well as testimony, regarding the mortgage payments made throughout the marriage, during the divorce proceedings, and up until the point of trial. In his amended judgment, the chancellor stated that his original judgment had failed to consider Bill's payments because he had not been presented with a total amount for these payments. The chancellor further explained that his amended judgment took Bill's payments into consideration and found that the remaining balance on the home was actually less than his original approximation.

¶44. Sandy argues that the present case is analogous to *Trovato v. Trovato*, 649 So. 2d 815, 817-18 (Miss. 1995), wherein the Mississippi Supreme Court found that an ex-wife, who had made almost 80% of the home mortgage payments, "might not be necessarily entitled to a share of the proceeds proportionate to the payments she made" because she had benefitted from occupying the house. But the Supreme Court also acknowledged that the ex-husband

20

was not necessarily entitled to an equitable share either. *Id*. at 818 (citing *Brown v. Brown*, 574 So. 2d 688, 691 (Miss. 1990)). In fact, no spouse is "automatically entitled to an equal division of jointly-accumulated properties. The matter rather is committed to the discretion and conscience of the Court, having in mind all of the equities and other relevant facts and circumstances." *Brown*, 574 So. 2d at 691.

¶45.    Taking the chancellor's considerable discretion into account, we find that substantial evidence supports his decision to reassess the marital home's equity, thereby giving Bill an additional $3,625 in equity. We therefore find that the chancellor did not abuse his discretion.

### III.    Whether the chancellor erroneously denied Bill's request for separate maintenance or alimony.

¶46.    In his answer to Sandy's complaint, Bill petitioned the chancellor for temporary and permanent separate maintenance until the parties reconciled. But the chancellor ultimately granted Sandy a divorce and, therefore, denied and dismissed Bill's separate-maintenance claim as moot. Bill now makes another general assertion that because the chancellor erroneously granted the divorce, the chancellor erroneously denied and dismissed Bill's request for separate maintenance.

¶47.    "Separate maintenance is a court-created equitable relief based upon the marriage relationship and is a judicial command to [a spouse] . . . to provide suitable maintenance of [the other spouse] until such time as they may be reconciled with each other." *G.B.W. v. E.R.W.*, 9 So. 3d 1200, 1208 (¶15) (Miss. Ct. App. 2009). But when we affirm the

21

chancellor's decision to grant a divorce, separate maintenance becomes a moot issue. *Id*. Because this Court affirms the judgment of divorce, we likewise found Bill's claim to be moot.

¶48.    In his opinion, the chancellor found that neither party had requested or argued for alimony. Therefore, the chancellor did not award alimony to either party. Bill now argues on appeal that even if the divorce and denial of separate maintenance were affirmed, this Court should still find that the chancellor erroneously failed to consider awarding alimony to him as it relates to his separate-maintenance claim.

¶49.    But this Court can find nowhere in the record where Bill made a claim for alimony before the chancellor. In fact, throughout the divorce proceedings, Bill steadfastly fought against the divorce and pled for reconciliation of the parties. Bill also made no argument for alimony in his motion for new trial or amendment of the judgment. "Issues raised for the first time on appeal are procedurally barred. The well-recognized rule is that a [chancellor] will not be put in error on appeal for a matter not presented to [him] for decision." *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶36) (Miss. 2013). Bill never addressed alimony before the chancellor, and now he cannot attempt to hold the chancery court in error for this issue.

¶50.    Furthermore, Bill argues in his brief that he is entitled to alimony without offering the Court any authority or support for his assertion. We decline to address assignments of error that are not supported by sufficient argument or authority. *Stubbs v. Stubbs*, 281 So. 3d 125, 127 (¶7) (Miss. Ct. App. 2019). Because Bill raises the issue of alimony for the first time on

22

appeal and offers no support as to why he is entitled to such, we find this issue to be meritless.

### IV. Whether the chancellor erred in his determination of attorney's fees.

¶51. Both parties also take issue with the chancellor's determination of attorney's fees. Specifically, Bill contests the chancellor's award of $10,750 in attorney's fees to Sandy in the original opinion and final judgment without properly analyzing Sandy's ability to pay under *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982). Sandy challenges the chancellor's amended judgment wherein he determined that Bill was not required to reimburse Sandy for $2,500 in attorney's fees sanctioned against her by the previous chancellor.

### a. Whether the chancellor erroneously awarded Sandy with attorney's fees without a proper *McKee* analysis.

¶52. In the original opinion and final judgment of divorce, the chancellor ordered Bill to pay Sandy $10,000 in attorney's fees for the divorce action and an additional $750 for Sandy's second contempt action. In his motion for a new trial or amendment of judgment, Bill argued that the chancellor failed to include any *McKee* analysis or discussion regarding Sandy's ability to pay prior to awarding her attorney's fees. In his order amending the judgment, the chancellor upheld his prior ruling, stating, "In regards to the attorney['s] fees, the Court denies Mr. Gilmer's requested relief, in full. Based upon the evidence presented, the Court determines that the award of attorney['s] fees under *McKee* [is] appropriate." Bill now argues both the original and the amended judgments are void of any *McKee* discussion

or analysis, and therefore this Court should reverse the chancellor's award of attorney's fees.

¶53.    Generally, a chancellor should only award attorney's fees where the moving party shows an inability to pay. *Black v. Black*, 240 So. 3d 1226, 1235 (¶27) (Miss. Ct. App. 2017) (citing *Stuart v. Stuart*, 956 So. 2d 295, 298 (¶20) (Miss. Ct. App. 2006)).  Before granting or denying attorney's fees, a chancellor must apply the *McKee* factors.  *Id*. (quoting *Rogers v. Rogers*, 94 So. 3d 1258, 1267 (¶30) (Miss. Ct. App. 2012)).  These factors include:

> (1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Id*. (citing *Burnham–Steptoe v. Steptoe*, 755 So. 2d 1225, 1236 (¶37) (Miss. Ct. App. 1999)).

¶54.    Sandy argues that the chancellor's lack of a factor-by-factor analysis should not preclude the award of attorney's fees.  *See Branch v. Branch*, 174 So. 3d 932, 946 (¶¶59, 61) (Miss. Ct. App. 2015).  In *Baswell v. Baswell*, 217 So. 3d 753, 758-59 (¶23) (Miss. Ct. App. 2017), we applied our holding from *Branch* and stated:

> In *Branch*, the chancellor found that the ex-wife lacked the ability to pay her attorney fees.  This Court stated that, although the chancellor never explicitly considered the individual *McKee* factors, the chancellor found the ex-wife['s] attorney fees reasonable in accordance with *McKee*.  Despite some omissions in the chancellor['s] findings and the lack of a factor-by-factor analysis under *McKee*, we concluded that the chancellor accurately relied on the ex-wife['s] financial position and correctly awarded attorney fees.  We therefore found no manifest error in the chancellor['s] decision to award reasonable attorney fees.

In both *Branch* and *Baswell*, we found that the chancellor had made at least some finding that the parties had an inability to pay, and we upheld the chancellor's award of attorney's fees.

24

*See Baswell*, 217 So. 3d at 759 (¶¶24-25); *Branch*, 174 So. 3d at 946 (¶¶59-62).

¶55.    While Sandy is correct that the lack of a factor-by-factor analysis does not immediately warrant a reversal, "the proof must at least support an accurate assessment of fees under the *McKee* criteria." *Evans v. Evans*, 75 So. 3d 1083, 1090 (¶25) (Miss. Ct. App. 2011). We recently reversed an award of attorney's fees where the chancellor made a general conclusion on the record that an ex-wife had an inability to pay but offered no *McKee* analysis of the ex-wife's financial condition to support such conclusion. *Vandenbrook v. Vandenbrook*, No. 2017-CA-00847-COA, 2019 WL 1349714, at *11 (¶49) (Miss. Ct. App. Mar. 26, 2019), *cert. denied*, 279 So. 3d 1087 (Miss. 2019). We held that "[a]lthough the decision to award attorney's fees in a divorce proceeding is left to the sound discretion of the chancellor, there must be evidence undergirding the chancellor's decision that a party is unable to pay her attorney's fees before an award can be made." *Id*.

¶56.    Here, the only time the chancellor mentioned *McKee* was in a general statement in his amended judgment that the award of attorney's fees were appropriate. There was no *McKee* analysis or discussion of Sandy's inability to pay in the original or amended judgment, and the record reflects no such evidence. Because we find a lack of evidence exists to support the chancellor's decision, we find that the chancellor abused his discretion in awarding attorney's fees to Sandy. As such, we reverse the chancellor's award of attorney's fees to Sandy and remand this case for the chancellor to apply the *McKee* factors in determining

25

Sandy's ability to pay.[3]

> **b.** **Whether the chancellor erroneously found that Bill should not reimburse Sandy for attorney's fees she paid to Bill for a prior contempt action.**

¶57. The parties filed several motions for contempt throughout the divorce proceedings. As stated, Sandy and Bill first filed competing motions for contempt on October 15, 2014, and October 23, 2014, respectively. On October 30, 2014, the previous chancellor conducted an on-the-record hearing on both motions. The previous chancellor ultimately found Sandy's motion to be frivolous and ordered her to pay Bill $2,500 in attorney's fees as a sanction. The chancellor entered his rulings orally into the record but died prior to entering a written order. Sandy paid $2,500 to Bill to avoid any further contempt matters.

¶58. The succeeding chancellor presided over all remaining matters in this case. In the original opinion and final judgment, the chancellor found that the previous chancellor's $2,500 sanction of attorney's fees against Sandy "died on the vine," as it was never reduced to a written order. As such, the chancellor ordered Bill to reimburse Sandy the $2,500 she had paid pursuant to the previous chancellor's ruling.

¶59. In his motion for new trial or amendment of judgment, Bill challenged the

---

[3] On September 25, 2019, Sandy filed a motion before this Court, requesting an award of $5,375 in attorney's fees related to this appeal, or one-half the chancellor's total award of attorney's fees. *See Lauro v. Lauro*, 924 So. 2d 584, 592 (¶33) (Miss. Ct. App. 2006). However, because we reverse and remand the chancellor's award of attorney's fees to Sandy for a proper *McKee* analysis, we likewise deny Sandy's motion for attorney's fees on this appeal.

chancellor's ruling that he reimburse the $2,500. Bill claimed that following the contempt hearing his attorney drafted a proposed order of the previous chancellor's rulings and presented it to Sandy, Sandy's attorney, and the chancellor. But because Sandy's attorney objected to the proposed order, it was never entered, and the previous chancellor died before any order was entered. Bill argued that it was inequitable to punish him for the circumstances surrounding the lack of a written order after the contempt hearing. In the amended judgment, the chancellor agreed with Bill's argument and reversed his previous ruling, finding that Bill was not required to reimburse Sandy the $2,500.

¶60. In her cross-appeal, Sandy now challenges the chancellor's amended judgment, arguing that the chancellor erred in finding that Bill was not required to reimburse Sandy for the $2,500. She argues that the chancellor's original judgment correctly found that the previous chancellor's ruling "died on the vine" when it was not reduced to writing. Sandy's "died-on-the-vine" argument arose after the following exchange occurred at trial:

| Court: | Why was an Order never entered . . . if he gave a bench ruling? |
|---|---|
| Sandy's Counsel: | We did not agree to the terms. [Bill's counsel] added things in there that [the previous chancellor] didn't order, and nobody bothered to get the ruling to finish the Order. |
| Court: | So it just *died on the vine*, so to speak. . . . Well, then, if there's no court order, unless we had a transcript of the proceedings, . . . I don't know what he said or what he did. . . . |

¶61. While it is unclear exactly when the October 30, 2014 hearing was transcribed, the

27

record does contain the transcript from the hearing held by the previous chancellor. The transcript clearly reflects the previous chancellor's detailed ruling wherein he found Sandy's first motion for contempt to be frivolous, unsubstantiated, and unsupported by evidence. The previous chancellor repeatedly called Sandy's motion "patently" and "utterly" frivolous and ordered her to pay Bill $2,500 as a sanction. During argument on Bill's motion for new trial or amendment of the judgment, Bill's attorney told the current chancellor that he had transcribed the October 30, 2014 hearing. We therefore surmise that the chancellor at least had the benefit of seeing the transcript prior to entering his amended judgment.

¶62. We note that the best practice for all trial-level courts is to transform all bench rulings into written orders. But based upon the totality of the circumstances, we find it inequitable to punish Bill in this situation. As stated, the transcript clearly reflects the previous chancellor's findings and decision to sanction Sandy for filing a frivolous contempt motion. While Bill's attorney drafted a proposed order with these findings, the record shows that the parties' attorneys could not agree upon the proposed order, and therefore no written order was entered before the previous chancellor's death. But the record also reflects that the succeeding chancellor had the benefit of this transcript some time prior to issuing his amended judgment. We cannot hold the chancery court in error under these circumstances, and we therefore find that the chancellor was within his discretion to amend his original judgment.

**CONCLUSION**

¶63. Upon review, we find that substantial evidence supports the chancellor's decision to grant Sandy a divorce based upon the ground of habitual cruel and inhuman treatment, and we therefore affirm the judgment of divorce. We also find that substantial evidence supports the chancellor's equitable distribution of the couple's marital property, including the chancellor's assessment of the Copiah Bank line of credit against Sandy and the chancellor's award of an additional $3,625 in equity to Bill. We further find no error in the chancellor's decision to deny Bill separate maintenance or alimony, and as such, we affirm these decisions.

¶64. We also find no error in the chancellor's determination that Bill was not required to reimburse Sandy for the $2,500 sanctioned against her by the previous chancellor. We therefore affirm this decision. But we do find that the chancellor erroneously awarded Sandy $10,750 in attorney's fees without making a proper *McKee* analysis or discussing Sandy's ability to pay. As such, we reverse the chancellor's award of attorney's fees and remand this case for the chancellor to apply the *McKee* factors and to determine Sandy's ability to pay.

¶65. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**