# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-02120-COA

**RAYMOND CURTIS BRANCH**                                        **APPELLANT**

**v.**

**LAUREN HOOVER BRANCH**                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/12/2013 |
| TRIAL JUDGE: | HON. VICKI B. COBB |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | TIFFANY ALAYNE YATES |
| ATTORNEY FOR APPELLEE: | LUTHER PUTNAM CRULL JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | DIVORCE GRANTED TO APPELLEE ON GROUND OF ADULTERY; CUSTODY OF TWO MINOR CHILDREN AWARDED TO APPELLEE, WITH VISITATION AWARDED TO APPELLANT; APPELLANT ORDERED TO PAY CHILD SUPPORT, ORDERED TO MAINTAIN HEALTH INSURANCE FOR CHILDREN, AND ORDERED TO PAY SEVENTY-FIVE PERCENT OF MEDICAL AND EDUCATIONAL EXPENSES FOR CHILDREN; APPELLANT ORDERED TO MAINTAIN LIFE-INSURANCE POLICY AS LONG AS ONE CHILD IS UNEMANCIPATED; MARITAL PROPERTY DIVIDED; APPELLANT AWARDED ALL INTEREST AND ASSETS OWNED BY HIS BUSINESS; APPELLANT ORDERED TO PAY REHABILITATIVE ALIMONY TO APPELLEE FOR SEVENTY-TWO MONTHS; APPELLANT ORDERED TO PAY $28,242.95 IN ATTORNEY'S FEES |
| DISPOSITION: | AFFIRMED: 09/15/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING AND GRIFFIS, P.JJ., AND MAXWELL, J.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.    Raymond Curtis Branch (Curt) argues that the chancery court erred in its calculation of child support, the division of marital property, and the award of alimony. Curt also argues that the chancellor erred in granting sole legal custody to his wife, setting visitation with transportation costs, and ordering him to pay his wife's attorney's fees. We find no error and affirm.

FACTS AND PROCEDURAL HISTORY

¶2.    Curt and Lauren Branch married in 1999. Prior to marriage, Curt and Lauren attended Mississippi State University together. After they graduated in 1999, they moved to Jackson for Curt to attend dental school. While Curt went to school, Lauren worked as an interior designer for an architectural firm.

¶3.    In 2003, Curt graduated from dental school, and they moved to Winona, where Curt worked for Lauren's father's dental clinic. Lauren continued to commute to Jackson for work until she became pregnant with their second child. They had two children, one born in 2002 and the second in 2004.

¶4.    Curt attended several dental seminars. At a seminar in Tunica in June 2011, Curt met Kirsten Lipert, a dental equipment sales representative. Curt and Kirsten continued to see each other at other dental seminars in Florence, Alabama, and Nashville, Tennessee. In August 2011, while at the Nashville seminar, Curt and Kirsten initiated a sexual relationship.

¶5.    Curt and Kirsten continued to see each other over the course of several months. In

2

November 2011, Curt admitted his affair to Lauren. They separated, and Curt lived in an apartment until June 2012. Curt then moved to Kirsten's house in Franklin, Tennessee.

¶6. On November 22, 2011, Lauren filed a complaint for divorce and a petition for temporary relief. On March 19, 2012, the chancellor entered an agreed temporary order that awarded Lauren temporary custody of the children, use of the home, separate maintenance, temporary child support, and other expenses, totaling $4,360 per month.

¶7. A hearing on their divorce began on June 11, 2013. On September 12, 2013, the chancellor granted Lauren a divorce on the grounds of adultery. The chancellor issued a bench opinion that set child custody and visitation, child support, rehabilitative alimony, distribution of marital property, and attorney's fees.

¶8. On November 19, 2013, the chancellor entered a final judgment, which incorporated her bench rulings. The chancellor awarded full legal and physical custody of the children to Lauren and gave Curt visitation privileges, provided he pay the transportation costs to and from Winona. Lauren also received the equity in the marital home and rehabilitative alimony of $1,000 per month for seventy-two months. The chancellor also ordered Curt to pay $1,800 per month in child support, pay seventy-five percent of the children's education costs, and maintain a life-insurance policy of $500,000 with the children and Lauren as beneficiaries, until emancipation of the children. Further, the chancellor held Curt responsible for his student-loan and line-of-credit debts. Curt appeals this judgment.

STANDARD OF REVIEW

¶9. In domestic-relations cases, this Court will not disturb a chancellor's judgment when

3

it is supported by substantial credible evidence unless the chancellor abused her discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard. *Rolison v. Rolison*, 105 So. 3d 1136, 1137 (¶4) (Miss. Ct. App. 2012) (citation omitted). "If the chancellor's findings are supported by substantial evidence, then we will affirm." *Id*. (citation omitted). Questions of law, however, are reviewed de novo. *Price v. Price*, 22 So. 3d 331, 332 (¶8) (Miss. Ct. App. 2009) (citation omitted).

ANALYSIS

I.   *Whether the chancellor erred in granting sole legal custody to Lauren, with visitation and transportation costs to Curt.*

¶10.   Curt contends the chancellor erred in awarding Lauren sole legal custody of their children. Further, Curt argues the chancellor's determinations on legal custody, visitation, and transportation costs interfere with his relationship with his children and are not in the best interests of the children.

A.   *Legal Custody*

¶11.   "'Legal custody' means more than simply having information about one's child; such responsibility and authority means sharing of 'decision-making rights, the responsibilities[,] and the authority relating to the health, education[,] and welfare of a child.'" *Lowrey v. Lowrey*, 25 So. 3d 274, 296-97 (¶54) (Miss. 2009) (quoting Miss. Code Ann. § 93-5-24 (Supp. 2014)). Further, "[t]he statute creates a presumption in favor of joint custody where the parents have agreed to it." *Id.*

¶12.   Curt primarily contends the chancellor erred in awarding Lauren sole legal custody on the basis of her objection to any type of joint-custody arrangement rather than making the

4

decision based on the best interests of the children. The record, however, indicates the chancellor made a finding that the best interests of the children favored Lauren having sole physical and legal custody.

¶13. A chancellor determines custody based on a number of factors set forth in *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). "The *Albright* factors are a guide for chancellors in weighing the facts to determine the child's best interest." *Hamby v. Hamby*, 102 So. 3d 334, 337 (¶14) (Miss. Ct. App. 2012) (quoting *Wilson v. Wilson*, 79 So. 3d 551, 566 (¶63) (Miss. Ct. App. 2012)). Further, "the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Id.*

¶14. The *Albright* factors are:

> (1) the child's age, health, and sex; (2) which parent had the continuity of care before the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide primary child care; (5) each parent's employment and its responsibilities; (6) each parent's physical and mental health and age; (7) the emotional ties between the child and each parent; (8) each parent's moral fitness; (9) the child's home, school[,] and community record; (10) the child's preference, if the child is over twelve years old; (11) the stability of the home environment; and (12) any other relevant equitable factor.

*Id.* at (¶15) (citation omitted).

¶15. The chancellor included an *Albright* analysis in her bench ruling, and incorporated those findings into the November 19, 2013 judgment. The chancellor found the factors of the children's age, health, and sex; continuity of care; parenting skills; employment; moral fitness; children's home, school, and community record; and stability of the home environment all weighed in favor of Lauren. The chancellor also found the factor of the

5

children's preference inapplicable as neither child had reached the required age to voice a preference.

¶16. The chancellor further determined in the bench ruling that the willingness to provide child care, emotional ties, and the physical and mental health of the parents were neutral factors, even though the chancellor later found these factors favored Lauren in the judgment. Despite these inconsistencies between the ruling from the bench and the order, the factors predominately favored Lauren.

¶17. In the judgment, the chancellor extended these findings to the determinations of physical and legal custody. Curt rests his argument on the chancellor's bench ruling when the chancellor stated, "normally I don't grant joint legal custody unless both parties are agreeable to that." However, the Mississippi Supreme Court has "noted that parents who experience substantial animosity will find it 'manifestly impossible' to function under a joint custody award." Deborah H. Bell, *Mississippi Family Law* § 5.04(3)(b) (2005) (quoting *Rutledge v. Rutledge*, 487 So. 2d 218, 220 (Miss. 1986)).

¶18. While the chancellor must address the best interests of the child in determining legal custody, the chancellor retains discretion in determining custody. "[U]nless the parents are capable of sharing joint custody cooperatively, it is incumbent upon a chancellor not to award joint custody. This is for the chancellor to determine as he or she is in the best position to evaluate the credibility, sincerity, capabilities[,] and intentions of the parties." *Crider v. Crider*, 904 So. 2d 142, 147 (¶13) (Miss. 2005).

¶19. We find that the chancellor properly applied the *Albright* factors to resolve the issue

6

of custody. Curt correctly claims that the chancellor only addressed legal custody in the bench opinion in the context of Lauren's objection to joint custody. Nevertheless, the chancellor included legal custody in the conclusion of the *Albright* analysis in the judgment of divorce. Therefore, we find no error in the chancellor's award of sole legal custody to Lauren.

### B. Visitation

¶20. Curt next objects to the visitation schedule and the requirement that he pay all transportation costs in order to exercise his visitation. The chancellor awarded Curt visitation on every other weekend, alternating holidays, half of summer vacation, and other concessions. Curt opposes this arrangement because the distance between Nashville and Winona requires a twelve-hour round-trip that would interfere with his visitation.

¶21. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon." *Fountain v. Fountain*, 877 So. 2d 474, 481 (¶26) (Miss. Ct. App. 2003) (citing *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994)). "In determining visitation, the chancellor must continue to keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child." *Id.*

¶22. "The supreme court has addressed the very issue of what would encompass the minimum of a liberal visitation provision." *Chalk v. Lentz*, 744 So. 2d 789, 792 (¶9) (Miss. Ct. App. 1999) (quoting *Crowson v. Moseley*, 480 So. 2d 1150, 1153 (Miss. 1985)). The

supreme court has "held that 'children at the least are entitled to the company of [the noncustodial parent] two full week-ends a month during the school year, with the visitation to terminate late Sunday afternoon as opposed to Sunday morning, and a five-week period during summer vacation.'" *Id.*

¶23. The chancellor awarded liberal visitation following the same guidelines set forth in *Chalk*. Curt challenges this visitation schedule based on the time required to transport the children from Winona to Nashville then back to Winona. Though the chancellor did not alter visitation to account for the distance between Winona and Nashville, the chancellor enjoys wide discretion in setting visitation and was not required to do so. *See Fountain,* 877 So. 2d at 481 (¶27) (court upheld standard visitation when custodial parent moved to Florida while noncustodial parent remained in Mississippi). Therefore, we find that Curt failed to show the visitation arrangement compromises his relationship with his children or undermines the best interests of the children.

¶24. The chancellor also retains discretion in determining transportation costs. *Ballard v. Ballard*, 843 So. 2d 76, 80 (¶15) (Miss. Ct. App. 2003). "There is no authority in Mississippi to the effect that the non-custodial parent is entitled to the assistance of the former spouse in the logistical aspects of exercising visitation rights." *Hulse v. Hulse*, 724 So. 2d 918, 919 (¶6) (Miss. Ct. App. 1998). However, any interference in the noncustodial parent's ability to exercise visitation may warrant a compromise in transportation costs. *Id.* at (¶5).

¶25. This Court in *Hulse* stated:

> In those cases where it could be demonstrated that the ability of the non-custodial parent to enjoy a suitable visitation schedule was substantially

impaired because of difficulties in transportation that could only be resolved by the reasonable participation of the custodial parent, it could well be that the chancellor would be manifestly in error in refusing to order some measure of cooperation from the custodial parent. That, however, would appear to be a question of fact and not an issue of law.

*Id.*

¶26. As to the interference with his visitation rights, Curt merely asserts that bearing the transportation costs will pose a financial strain. Although Curt may eventually be able to establish an undue financial burden or interference with his visitation rights, he may do so in a modification proceeding at a later date. Based on the evidence before the chancellor at the time of the divorce, we find that the chancellor did not abuse her discretion in setting the visitation schedule and costs.

II. *Whether the chancellor erred in calculating child support.*

¶27. Curt next claims that the chancellor erred in determining the amount of child support due. He claims the chancellor made an improper calculation of his adjusted gross income. Primarily, Curt argues the chancellor inaccurately determined his actual income and failed to account for taxes and expenses in the final calculation of his adjusted gross income.

¶28. "Both parents are obligated to provide financially for their children." *Forrest v. McCoy*, 941 So. 2d 889, 891 (¶11) (Miss. Ct. App. 2006) (citing *Lacey v. Lacey*, 822 So. 2d 1132, 1140 (¶36) (Miss. Ct. App. 2002)). "The statutory presumption is that the non-custodial parent will provide support and it will be in a specific percentage of gross income." *Id.*

¶29. Statutory guidelines dictate the child-support amount based upon a percentage of the

9

noncustodial parent's adjusted gross income. *White v. White*, 722 So. 2d 731, 733 (¶17) (Miss. Ct. App. 1998). Mississippi Code Annotated section 43-19-101(1) (Supp. 2014) sets the percentage of child support for two minor children at twenty percent.

¶30. "[C]omputing one's income for taxation is different than computing one's income for child support purposes . . . . Our statutes delineate what is to be considered as gross income for the purposes of computing child support." *Bustin v. Bustin*, 806 So. 2d 1136, 1140 (¶11) (Miss. Ct. App. 2001).

¶31. Gross income pursuant to Mississippi Code Annotated section 43-19-101(3)(a) (Supp. 2014) is calculated as follows:

> Determine gross income from all potential sources that may reasonably be expected to be available to the absent parent including, but not limited to, the following: wages and salary income; income from self-employment; income from commissions; income from investments, including dividends, interest income[,] and income on any trust account or property; absent parent's portion of any joint income of both parents; workers' compensation, disability, unemployment, annuity and retirement benefits, including an Individual Retirement Account (IRA); any other payments made by any person, private entity, federal or state government or any unit of local government; alimony; any income earned from an interest in or from inherited property; any other form of earned income; and gross income shall exclude any monetary benefits derived from a second household, such as income of the absent parent's current spouse[.]

Additionally, "in arriving at the adjusted gross income figure, the chancellor must include income from many sources, but not all expenses. The allowable deductions for this figure are statutory, and they differ from the allowable deductions for income tax purposes . . . ." *Coggins v. Coggins*, 81 So. 3d 285, 291 (¶19) (Miss. Ct. App. 2012).

¶32. Here, Curt used a tax professional, Chris Mahan, to show his gross income for tax

10

purposes. A chancellor, however, is not required to use gross income for tax purposes to discern gross income for child-support purposes. *See Nix v. Nix*, 790 So. 2d 198, 200 (¶5) (Miss. 2001) ("The chancellor, applying equity principles, may consider . . . expenditures in determining whether they were legitimate business expenditures in ultimately determining . . . available income to meet . . . [the] child-support obligation."). Therefore, Mahan's estimation of Curt's income did not bind the chancellor to that amount.

¶33. When determining Curt's adjusted gross income, the chancellor found Curt was not forthcoming about his income. "[E]ach party in every domestic case involving economic issues and/or property division shall provide the opposite party or counsel, if known, the following disclosures: . . . [a] detailed written statement of actual income and expenses and assets and liabilities[.]" UCCR 8.05. This form must also include tax information. *Id.*

¶34. On his Rule 8.05 financial statement, Curt disclosed his income, expenses, assets, and liabilities and attached only his 2012 tax information, which showed a loss for the tax year. Curt did not disclose any additional tax information. Although Curt contends the chancellor erred in calculating his tax deductions, Curt did not supply the chancellor with sufficient information regarding these deductions.

¶35. Further, the chancellor questioned several transactions between Kirsten and Curt, but did not attribute these transactions to Curt's income. Based on Curt's testimony, which the chancellor deemed evasive, the chancellor imputed additional income to his reported income. According to *Swiderski v. Swiderski*, 18 So. 3d 280, 286 (¶25) (Miss. Ct. App. 2009), this Court held:

11

Where a chancellor is not convinced of the honesty or veracity of the parent concerning the parent's ability to abide by his or her financial obligations, the chancellor is not precluded from factoring this skepticism in the equation when determining the amount of the child support award. Furthermore, [t]he chancellor can base child support on the parent's potential earning capacity.

(Internal citations and quotations omitted).

¶36. The chancellor here looked to Curt's reported income of $750 per day as a contract worker at Delta Dental Care Clinic, where Curt testified he worked two days a week and an additional day every other week. Thus, the chancellor computed Curt's income at $750 per day for three days a week, totaling $117,000 annual earnings. This calculation did not take into account Curt's additional work at Nashville Smiles, including his earnings as a fifty percent owner.

¶37. Chancellors often have a difficult time in deciding financial matters in a divorce. The chancellor must rely on the parties to present detailed, relevant financial information. Sometimes the circumstances of the divorce may cause some ambiguity as to the current or future earning capacity of one or both spouses. Here, the circumstances of the divorce created an even more difficult decision by the chancellor. If Curt had continued his dental practice in Winona, there would have been accurate historical financial information upon which the chancellor could have based her opinion. This did not happen. Curt's professional relationship with Lauren's father had a negative impact on his future earning capacity. Likewise, Curt's decision to relocate from Winona, where he had spent several years building his dental practice, to the Nashville area, where he would have to start over building his dental practice, had a negative impact on his future earning capacity. Nevertheless, the

12

chancellor must deal with the parties as she finds them and make the best decision possible based on the financial information that is available and offered by the parties into evidence.

¶38. The chancellor determined that Curt's adjusted gross income was $117,000. The chancellor determined the monthly child-support payment would be $1,950 and subtracted taxes for a child-support award of $1,800 per month. Based on the evidence presented, we find that the chancellor's decision was reasonable and supported by the evidence presented at trial. We also recognize that the chancellor's determination of child support may be modified, increased, or decreased based on Curt's income as his dental practice in the Nashville area becomes more established. As a result, we find no merit to this issue.

III. *Whether the chancellor erred in the division of marital property.*

¶39. Curt's main contentions concerning the chancellor's division of the marital property are the chancellor failed to classify the property, and the chancellor erroneously attributed additional income to Curt. "[W]hen dividing marital property, 'chancellors are directed to (1) classify the parties' assets as marital or separate; (2) determine the value of those assets; (3) divide the marital estate equitably based upon the factors set forth in *Ferguson*; and (4) consider the appropriateness of alimony if either party is left with a deficiency.'" *Roberts v. Roberts*, 135 So. 3d 935, 940 (¶13) (Miss. Ct. App. 2014) (quoting *Dickerson v. Dickerson*, 34 So. 3d 637, 643-44 (¶23) (Miss. Ct. App. 2010)).

¶40. "In dividing the property of the divorcing couple, the chancellor must first classify their assets and liabilities as belonging to the marriage, to the husband, or to the wife." *Smith v. Smith*, 856 So. 2d 717, 719 (¶8) (Miss. Ct. App. 2003) (citing *Hemsley v. Hemsley*, 639

13

So. 2d 909, 914 (Miss. 1994)).

¶41. After classification and valuation, chancellors must equitably divide the marital property in accordance with the factors dictated in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). The factors are:

(1) Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows: (a) [d]irect or indirect economic contribution to the acquisition of the property; (b) [c]ontribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and (c) [c]ontribution to the education, training[,] or other accomplishment bearing on the earning power of the spouse accumulating the assets[;]

(2) The degree to which each spouse has expended, withdrawn[,] or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree[,] or otherwise[;]

(3) The market value and the emotional value of the assets subject to distribution[;]

(4) The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

(5) Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

(6) The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

(7) The needs of the parties for financial security with due regard to the combination of assets, income[,] and earning capacity; and

(8) Any other factor which in equity should be considered.

*Id.*

14

¶42. Curt primarily argues the chancellor incorrectly classified his interest in Nashville Smiles as marital property even though the business opened after Curt and Lauren separated. "[W]hen equitably dividing marital property upon divorce, the date of valuation is necessarily within the discretion of the chancellor." *Hensarling v. Hensarling*, 824 So. 2d 583, 591 (¶25) (Miss. 2002) (quoting *MacDonald v. MacDonald*, 698 So. 2d 1079, 1086 (¶35) (Miss. 1997)). Further, "for the purposes of accumulating marital property, the time period runs from the date of marriage until the final judgment of divorce[,] [b]ut [the supreme court] has carved out an exception when an order for separate maintenance has been entered." *Cuccia v. Cuccia*, 90 So. 3d 1228, 1232-33 (¶8) (Miss. 2012).

¶43. The chancellor entered a temporary agreed order on March 19, 2012, which included separate maintenance for Lauren in the sum of $1,200.

> Assets acquired after an order for separate maintenance should be considered the separate property of the parties, absent a showing of either (1) contribution to the acquisition of the asset by the other spouse as contemplated in our decisions in [*Ferguson*, 639 So. 2d at 928-29], and *Magee v. Magee*, 661 So. 2d 1117, 1123 (Miss. 1995) or, (2) acquisition of the asset through the use of marital property.

*Godwin v. Godwin*, 758 So. 2d 384, 386 (¶7) (Miss. 1999) (internal citations omitted).

¶44. According to Curt's testimony, Nashville Smiles began operation in late March 2012, but Curt did not give a precise date. Regardless, Curt contends the business opened after the agreed temporary order, which effectively ended any further accumulation of marital property. Therefore, the business could not be considered an asset in determining the equitable division of property.

¶45. At the hearing for the bench rulings, the chancellor stated, "Nashville Smiles is a

15

dental business that is not subject to equitable division." The chancellor did not state whether Nashville Smiles constituted marital property or not. However, a failure to classify property does not automatically result in reversible error if the division of property is fair. *Kimbrough v. Kimbrough*, 76 So. 3d 715, 721 (¶27) (Miss. Ct. App. 2011).

¶46. Curt fails to show how the chancellor considered Nashville Smiles in dividing the marital property or how she inequitably divided the property. We have determined that the chancellor primarily looked at Nashville Smiles to determine Curt's current earning capacity. Further, the chancellor did not consider Nashville Smiles in allocating the equity in the marital home. Rather, the chancellor allowed Curt to retain the entirety of his retirement plan rather than divide the equity in the home and divide Curt's retirement.

¶47. As a further example of the inequitable division, Curt argues the chancellor disproportionately allocated the marital debt to him. "Debts acquired during the course of the marriage are also subject to equitable distribution." *Carter v. Carter*, 98 So. 3d 1109, 1114 (¶15) (Miss. Ct. App. 2012) (citation omitted). Curt fails to prove, however, the chancellor erred in allocating the debt. The chancellor's division did leave the majority of the debt to Curt, but a large portion of the debt, including attorney's fees, is Curt's separate debt. Therefore, Curt cannot show the chancellor inequitably allocated the debts.

¶48. Therefore, we find no merit to this issue.

IV. *Whether the chancellor erred in her determination of alimony.*

¶49. The chancellor awarded Lauren rehabilitative alimony of $1,000 for seventy-two months. According to Curt, the chancellor erred in granting alimony because of an incorrect

16

assessment of Curt's income and other relevant factors. Chancellors determine an award of alimony based on the factors provided by *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993):

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Id.*

¶50.    Specifically, "[r]ehabilitative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income. Moreover, '[t]he primary purpose of rehabilitative alimony is to give the former spouse the opportunity to enter the work force.'" *McCarrell v. McCarrell*, 19 So. 3d 168,

17

170 (¶8) (Miss. Ct. App. 2009) (quoting *Alexis v. Tarver*, 879 So. 2d 1078, 1080 (¶7) (Miss. Ct. App. 2004)) (internal citation omitted).

¶51. The chancellor correctly evaluated the award of alimony under the *Armstrong* factors. The chancellor found the factors of Lauren's earning capacity, income and expenses, needs, obligations and assets, and custody of the children weighed in Lauren's favor. Also, the chancellor found Curt's fault for the dissolution of the marriage favored Lauren. Further, the chancellor found the length of the marriage, the age of the parties, and the dissipation of assets did not favor alimony.

¶52. Primarily, the chancellor determined Lauren's position as a stay-at-home mom and her need for initial support ultimately favored an award of alimony. Also, based upon the financial records, the chancellor stated Lauren could have received a higher award, but lessened the amount and time for alimony. Further, the chancellor specifically intended the alimony award to support Lauren until she found sustainable employment and became self-sufficient.

¶53. Curt also contends on appeal the chancellor considered information not in evidence when the chancellor heard testimony on the financial information of Curt's girlfriend, Kirsten. The chancellor, Curt argues, incorrectly imputed a portion of Curt's income based upon the unsubstantiated inference that Curt pays a portion of Kirsten's financial obligations. However, Curt does not show how the chancellor used this inference to unfairly increase Curt's income and erroneously award alimony.

¶54. Therefore, we find no merit to this issue.

18

V.    *Whether the chancellor erred in granting attorney's fees.*

¶55.    As a final point of contention, Curt argues the chancellor erred in awarding Lauren attorney's fees.  Curt maintains the chancellor failed to consider his ability to pay attorney's fees or that Lauren's parents paid her fees at the time of the judgment.

¶56.    "An award of attorney's fees in domestic cases is largely a matter entrusted to the sound discretion of the trial court."  *Lauro v. Lauro*, 924 So. 2d 584, 591 (¶29) (Miss. Ct. App. 2006) (citations omitted).  "Unless the chancellor is manifestly wrong, his decision regarding attorney['s] fees will not be disturbed on appeal."  *Id.* (citing *Bredemeier v. Jackson*, 689 So. 2d 770, 778 (Miss. 1997)).

¶57.    "Generally, unless the party requesting attorney['s] fees can establish the inability to pay, such fees should not be awarded."  *Bredemeier*, 689 So. 2d at 778 (citing *Dunn v. Dunn*, 609 So. 2d 1277, 1287 (Miss. 1992)).  In order to determine the amount of attorney's fees, a chancellor must look to the factors enumerated in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

¶58.    The court in *McKee* stated: "We are also of the opinion the allowance of attorney[']s fees should be only in such amount as will compensate for the services rendered.  It must be fair and just to all concerned after it has been determined that the legal work being compensated was reasonably required and necessary."  *Id.*  The specific factors include

> the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*Id.* Further, "[w]here the record shows an inability to pay and a disparity in the relative financial positions of the parties, there is no error in awarding attorney's fees." *Tatum v. Tatum*, 105 So. 3d 1141, 1144 (¶9) (Miss. Ct. App. 2012) (citation omitted).

¶59.    The chancellor found Lauren lacked the ability to pay her attorney's fees. Though the chancellor did not explicitly consider the individual *McKee* factors, the chancellor found the fees reasonable in accordance with *McKee*. The lack of a factor-by-factor analysis under *McKee*, however, does not necessarily require reversal. *See A & L Inc. v. Grantham*, 747 So. 2d 832, 845 (¶61) (Miss. 1999) ("Reversal is warranted only where the failure to make sufficient findings of fact and conclusions of law constitutes manifest error.").

¶60.    Further, the chancellor found the home equity Lauren received almost covered the entirety of the fees, but the chancellor did not require Lauren to use the equity as payment for the attorney's fees. Appellate courts have found a party is not required to liquidate all assets to pay for attorney's fees. *See Hemsley*, 639 So. 2d at 915 (court ruled wife did not have to liquidate savings account to cover attorney's fees); *Wells v. Wells*, 800 So. 2d 1239, 1247 (¶¶16-17) (Miss. Ct. App. 2001) (court ruled wife did not have to use alimony to pay attorney's fees or liquidate retirement account to pay fees).

¶61.    The chancellor did not, however, address the payments of Lauren's attorney's fees by her parents and Curt's ability to pay the fees. In determining attorney's fees, the chancellor must determine the parties' relative abilities to pay. *McKee*, 418 So. 2d at 767. Despite this omission in the findings, the chancellor accurately relied on the financial position of Lauren and correctly awarded her attorney's fees. Therefore, the chancellor did not commit a

20

manifest error, and this issue is without merit.

¶62.    In addition, Lauren asks for the award of attorney's fees on appeal in an amount equal to one-half of the $28,242.95 in attorney's fees awarded to her by the chancellor.  In *Lauro,* this Court held that we "generally award[] attorney's fees on appeal in the amount of one-half of what was awarded in the lower court.  *Lauro*, 924 So. 2d at 592 (¶33) (citing *Monroe v. Monroe*, 745 So. 2d 249, 253 (¶17) (Miss. 1999)).  Attorney's fees are based upon necessity rather than entitlement. *Id."*  Here, we agree that Lauren is entitled to an award of attorney's fees for this appeal.  Hence, we have determined that an award to Lauren of the sum of $14,121.48 as attorney's fees on appeal is a reasonable amount.

¶63.    **THE JUDGMENT OF THE MONTGOMERY COUNTY CHANCERY COURT IS AFFIRMED, AND AN AWARD OF $14,121.48 IN ATTORNEY'S FEES ON APPEAL IS GRANTED TO THE APPELLEE.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

    **LEE, C.J., IRVING, P.J., BARNES, ISHEE, CARLTON, MAXWELL, FAIR, JAMES AND WILSON, JJ., CONCUR.**