# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00714-COA

**KENNETH MORELAND**                                                     **APPELLANT**

**v.**

**BRANDY SPEARS F/K/A BRANDY**                                           **APPELLEE**
**GREENWOOD MORELAND**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/24/2020 |
| TRIAL JUDGE: | HON. GEORGE WARD |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT EUGENE JONES II |
| | MICHAEL J. MALOUF |
| ATTORNEYS FOR APPELLEE: | KIMBERLY COURTNEY KING |
| | CONNIE MARIE SMITH |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 01/03/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     This appeal stems from a chancellor's decision to modify legal custody of a child by

awarding it solely to the child's mother. The chancellor also modified the father's visitation.

Finding no error, we affirm the chancery court's judgment.

## PROCEDURAL HISTORY

¶2.     Kenneth Moreland and Brandy Spears were divorced in August 2012 and entered into

a child custody, support, and property settlement agreement ("Divorce Agreement"). It

provided that Moreland and Spears would share joint legal custody of their minor child,

L.M.,[1] while Spears would have primary physical custody subject to Moreland's visitation rights. The Adams County Chancery Court approved the Divorce Agreement in August 2012.

¶3. In October 2019, Spears filed a "Petition for Modification and Other Relief" seeking to modify the Divorce Agreement by awarding her sole legal custody of L.M. and restricting Moreland's visitation. Moreland filed an "Answer and Counterclaim for Contempt and Modification," seeking sole legal and physical custody of L.M. He also asked the court to find Spears in contempt for refusing some of his scheduled visitation with L.M.

¶4. The matter was tried over the course of a two-day hearing in June 2020. The chancellor entered a final judgment in July 2020 granting Spears sole legal custody of L.M., limiting Moreland's visitation with L.M., and denying Moreland's counterclaim for contempt. Moreland filed a motion to reconsider in August 2020, which the chancellor denied in May 2021.

¶5. Moreland appealed both the final judgment and the order denying his motion for reconsideration. He claims that the chancellor erred by: (1) awarding Spears sole legal custody of L.M.; (2) reducing and restricting his visitation with L.M.; (3) declining to find Spears in contempt of the judgment adopting the Divorce Agreement; and (4) refusing his request for attorney's fees.

**STATEMENT OF FACTS**

¶6. The relevant portion of the parties' Divorce Agreement provides:

---

[1] We use initials to protect the identity of a minor child.

## CHILD CUSTODY and VISITATION

The parties mutually agree that the best interest of the parties' minor child namely, [L.M.], will best be served by the parties having joint legal custody of the minor child with the Mother having the primary physical custody of the minor child subject to the visitation rights of the Father as set forth hereinafter. The parties further agree to "exchange information concerning the health, education and welfare of the said minor [child], and to confer with one another in the exercise of decision making rights, responsibilities and authority" all as in accordance with Section 93-5-24(5)(e) of the Mississippi Code Annotated (1972). In the event the parties are unable to agree, the primary physical custodial parent shall have the decision making authority.

. . . .

When the minor child begins four (4) year old preschool, Father shall have visitation with the minor child on the 1st, 3rd, and 5th weekend of each month beginning at the time school is dismissed on Friday until he returns the child to school on Monday. In the alternate weeks, when the Father does not have weekend visitation, Father shall have an overnight visit with the minor child beginning at the time school is dismissed on Thursday returning her to school on Friday morning prior to [Spears'] weekend visitation with [L.M.], and he shall also have visitation the Monday after school until returning [L.M.] to school on Tuesday on the Monday following [Spears'] weekend visitation.

Beginning the summer after [L.M.] starts school, the parties shall alternate weekly periods with the minor child during the months of June and July by exchanging the minor child on Friday at 5:00 p.m. each Friday with Mother having the first week in odd numbered years and Father having the first week in even numbered years.

The parties shall alternate the holiday visitation periods with the minor child each year. The Holiday periods take precedence to the regular visitation periods. . . .

. . . .

Both parties shall at all times advise the other of the whereabouts of the minor child during their custodial periods while out of town and shall provide him/her with a phone number and allow him/her to have reasonable phone contact with the minor child. Further, each parent shall have the right to a daily phone call with the minor child on days he or she does not have visitation

3

with the minor child.

¶7. At the time of the hearing, L.M. was eleven years old and had just finished her fifth-grade year at a private school in Adams County. The evidence showed that L.M. was a smart, talented, and active girl. She maintained straight A's and practiced art and dance. She was involved in ballet and competitive cheer. She had several close friends.

¶8. Seven witnesses testified: L.M.; Moreland; Spears; Romana Finn, L.M.'s fourth-grade teacher; Amanda Dill, L.M.'s fifth-grade teacher; Angela Cotton, L.M.'s school principal; and Dr. Patricia Brawley, L.M.'s therapist.

¶9. Both of L.M.'s teachers and her principal provided similar testimony. They stated that L.M. was an intelligent student. But Finn noted that there were several instances when L.M. came to school crying or cried in the cafeteria or principal's office. She noted that those instances corresponded to the times directly before and after L.M.'s visitations with Moreland. She testified that L.M. never revealed the issues to her, but she realized "something [was] terribly wrong and [needed] to be thoroughly investigated." Finn wrote a sealed letter to Dr. Brawley detailing her concerns.

¶10. L.M.'s fifth-grade teacher, Dill, stated that she first became worried about L.M. after L.M. wrote a letter for their class "gratitude" box that read: "[She's] grateful that [her] dad is abusive because it makes [her] stronger." Dill discussed many instances of L.M. crying, shaking, or acting withdrawn. Dill stated that L.M. frequently did not have her homework completed after visitations with Moreland. Further, Dill discussed a moment when she asked L.M. why she was upset and L.M. disclosed that Moreland verbally abused her about her

4

appearance and weight. On cross-examination, Dill admitted that Moreland stayed involved in L.M.'s studies and had asked her to reach out if they ever became an issue. Further, she noted that she had never discussed L.M.'s issues with Moreland.

¶11. L.M.'s principal, Cotton, testified that she personally noticed behavioral changes when L.M. was around her father. She had also been put on notice of these changes by several individuals, including Finn and Dill, the school's cafeteria staff, and L.M.'s close friends. Cotton also discussed L.M.'s issues surrounding eating. She stated that several people were concerned that L.M. would not eat any food while she was at school. When confronted, L.M. said it was because her father made her eat expired food and that she was nervous to eat any food around others.

¶12. L.M. testified about Moreland's eccentricities and controlling nature. She described several "rituals" that Moreland required her to perform while she was at his house. These included washing the soles of her shoes before she entered his home, removing her socks in a particular way, and changing clothes before she sat on any furniture. L.M. brought four to five outfits to Moreland's house because he told her what to wear. L.M. testified that most of the actions her father took involved some sort of time-consuming pattern of behavior, though Moreland denied the existence of any rituals beyond the ones for entering the house.

¶13. L.M. testified that she was required to ask permission before she used the bathroom, and Moreland stood outside the bathroom and instructed her how to bathe.[2] Additionally,

---

[2] A previous lawsuit between the parties in 2017 was discussed during Spears' testimony. The basis of this 2017 petition for custody was centered on Moreland physically bathing L.M., who was eight years old at the time.

L.M. recalled a time when Moreland entered the bathroom as she was changing to smell her clothing and underwear for urine. Moreland then lectured her on hygiene. Moreland put L.M.'s socks on each morning, which L.M. did not describe as an affectionate interaction. Moreland often took between 30 minutes to an hour to change her sheets.

¶14. L.M. gave more examples of Moreland's time-consuming and controlling behavior and specifically discussed various Walmart trips and spontaneous vacations. L.M. stated that on many occasions Moreland would take her to Walmart for shopping trips that lasted up to six hours, or that lasted until past midnight. She explained that Moreland would spend a substantial amount of time examining and comparing different items for sale. Dr. Brawley later testified that this was a reoccurring and significant issue that L.M. discussed during their therapy sessions. L.M. testified she was required to stay very close to her father the entire time, and that people had approached her to ask if she was okay. L.M. was aware that Moreland's behavior was not normal.

¶15. L.M. also discussed a trip to Gatlinburg, Tennessee. She explained that Moreland did not tell her in advance that they were leaving and that this upset her. She said that Moreland decided to drive all night on the first night of the trip and fell asleep several times on the journey. At one point, she took a photo of Moreland asleep at the wheel while parked at a gas station. Moreland denied ever having fallen asleep while driving. Once at their destination, L.M. testified that she and Moreland always left the condo late and missed many attractions because of it. She felt constantly rushed, and Moreland was angry at her for failing to provide good directions during the trip. Although there were photos of L.M.

6

smiling, she stated that the trip was difficult.

¶16.    Further testimony from L.M. described the living conditions at Moreland's residence. L.M. stated that her father forced her to eat expired food every one to two hours that she was at his house. She explained that Moreland purchased the food after it had expired. She described Moreland's kitchen sink as having dishes that had been piled up for "four to five" years. She explained that Moreland would reuse paper towels and let them stack up on the counter, as illustrated by a photo she took of Moreland's countertop.

¶17.    L.M. also discussed her fear for her safety with Moreland. Moreland's vehicles had broken down several times. On at least one occasion, L.M. and Moreland had to rely on a stranger for assistance to get home. Because they were often late, Moreland was usually in a rush while driving. L.M. described his aggressive behavior on the road, which included speeding, driving on the curb, and exiting his vehicle in fits of road rage. She took a video of Moreland driving over 70 miles per hour on a bridge because Spears would not believe that he would ever actually do that. While much of L.M.'s testimony regarding her father was negative, she also said that she loved him and that she wanted to have a healthy relationship with him.

¶18.    Spears testified regarding Moreland's lack of cooperation as well as L.M.'s issues with Moreland. She testified that L.M. would sleep in the bed with her the night before and the night after she had visitation with Moreland. Spears added that this was not typical, and only happened around Moreland's visitation. Spears described her attempts to compromise with Moreland, including swapping time whenever L.M. wanted to spend the night at a

7

friend's house. However, Moreland would often deny these requests if they affected his scheduled visitation. Spears stated that she received at least one, if not several, texts a day from Moreland regarding his daily phone call with L.M.

¶19. Dr. Brawley testified that she did not believe Moreland was willing to compromise. She opined that he was unable to empathize and did not see things outside of his own perspective. She gathered from her therapy sessions with L.M. that Moreland's rituals and behaviors were a major stress factor for L.M. and Moreland. She noted that the time it took to perform Moreland's rituals caused them to be late to events, which led to his aggressive driving. Furthermore, she testified about L.M.'s emotions surrounding her interactions with Moreland. She stated that L.M. felt humiliated, scared, and often depressed. Dr. Brawley believed that the highly controlled environment and subjection to social isolation was negatively impacting L.M.'s mental health and schooling.

¶20. Dr. Brawley noted that many of the negative aspects of L.M.'s and Moreland's relationship involved taking L.M. to school and feeding her expired food. In addition, the rituals, comments on L.M.'s clothing and appearance, and the issues with L.M. bathing and changing clothes were all reasons Dr. Brawley believed it was best to limit Moreland's visitation to after breakfast and before dinner.

¶21. Moreland was the only witness to testify on his behalf. He mostly defended his actions and clarified the testimony of the opposing party. He said that he was unaware of many of the issues brought up and claimed that he should not be held accountable for things he did not know. He blamed the litigation as the cause for many of his issues, such as his

dirty house and the fact that he had not worked at all in the year prior to the hearing. Moreland acknowledged many of the issues and gave assurances that he would improve.

¶22. The chancellor found the testimony of L.M.'s teachers and principal to be credible. He also found Spears' testimony to be credible and believed that Spears was sincerely trying to encourage a healthy relationship between Moreland and L.M. The chancellor found Dr. Brawley's recommendation to limit overnight visitation to be persuasive. He agreed with Dr. Brawley that Moreland's behavior and controlling personality were having a detrimental effect on L.M.'s schooling despite the fact that L.M. maintained high grades.

¶23. The chancellor was unconvinced by Moreland's testimony that he was going to do better, noting that the history of the case had demonstrated a lack of positive change by him. The chancellor explained that many of the same issues had been reoccurring since L.M. was in preschool. The chancellor was particularly disturbed by Moreland's lack of boundaries. Specifically, the chancellor stated, "An eleven year old girl does not need her father to instruct her on how to clean her body."

¶24. The chancellor noted that Moreland's behavior demonstrated that he refused to listen to Spears, L.M., or the court's instructions to modify his behavior. Moreland's erratic driving habits continued, despite his knowledge that L.M. secretly recorded him in the car. The chancellor stated that Moreland not only failed to correct his own behavior, but "sees [conspiracies], is paranoid and filled with excuses for [L.M.]." Moreland testified that the reason he did not allow L.M.'s friends to come over to his house was because they would provide evidence to Spears to assist her with litigation. He testified that he would only go

9

to counseling if the court ordered it.

¶25. Accordingly, the chancellor held that there was substantial evidence that overnight visitation was detrimentally affecting L.M. He found Moreland's system of rituals "extreme" and stated that it was causing harm to L.M. He found that the cumulative effect of Moreland's behavior was harmful to L.M. and noted that there was extensive proof presented to demonstrate that. Consequently, he ordered that no overnight visitation occur for six months, followed by restricted overnight visitation afterward.

¶26. Next, the chancellor addressed Spears' request for sole legal custody of L.M. He found that there had been a material change of circumstances that had adversely impacted L.M. The primary basis for this conclusion stemmed from the combination of two separate findings. First, he found that Moreland's behaviors were getting worse not better. He noted that the behaviors themselves had intensified, while the lack of sensitivity, empathy, and personal responsibility amplified the negative effects. Second, he stated that L.M. was growing older and was more aware of Moreland's issues. This greater awareness had also led to L.M. being hurt and damaged by Moreland.

¶27. Furthermore, the chancellor found that material changes arose due to Moreland's lack of work, his lack of cooperation with Spears, and his refusal to allow L.M. to attend social functions during his visitation. The chancellor was concerned that Moreland had not done any work that year between the months of January and July. He was also concerned that Moreland was no longer investing and working towards ownership of his family farm. Testimony by Spears demonstrated a lack of understanding and cooperation between herself

10

and Moreland. There were several instances where the two disagreed on the visitation schedule. Spears testified that Moreland texted her daily regarding his phone call with L.M., even when he had actually seen L.M. in person. Finally, the court found that Moreland's refusal to allow L.M. to see her friends during his visitation was troubling. While Moreland's visitation during the school year was limited, he had substantial time with L.M. during the summers. In addition, Moreland required Spears to switch time with him whenever L.M. had a social event she could not miss.

¶28. Based on these facts, the chancellor determined there was a material change in circumstances since the original custody hearing and that the change was adversely affecting L.M. Next, the chancellor conducted an *Albright*[3] analysis, finding that the best interest of L.M. would be met by granting Spears full legal custody.

¶29. Finally, the chancellor addressed Moreland's claim that Spears should be held in contempt and that he receive attorney's fees as a result. Moreland alleged that Spears intentionally denied him visitation with L.M. through mid-March of 2020 until the date of trial on June 1, 2020. Spears admitted that on several occasions during this time period, she denied Moreland his precise visitation times. However, she testified that L.M. and Moreland spent several occasions together, usually at a neutral site with both Moreland and Spears present. Spears testified that she chose to deny Moreland his visitation because L.M. was "terrified" to see her father at the time. Spears' reasoning was that Moreland reacted badly to his discovery that L.M. had been secretly filming him, and that he told L.M. that he "never

---

[3] *Albright v. Albright*, 473 So. 2d 1003, 1005 (Miss. 1983).

wanted to see her again." Furthermore, Spears' attorney explained that she advised Spears against filing an emergency modification order because Mississippi courts were overwhelmed in the midst of the COVID-19 pandemic and subsequent shutdowns. The court found that Spears did not act contemptuously and denied Moreland's claim and request for attorney's fees.

STANDARD OF REVIEW

¶30. "This Court's limited standard of review when analyzing a chancellor's determinations in domestic-relations matters is well established." *Hardin v. Hardin*, 335 So. 3d 1088, 1092 (¶12) (Miss. Ct. App. 2022) (internal quotation marks omitted) (quoting *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶13) (Miss. Ct. App. 2020)). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Evans v. Evans*, 75 So. 3d 1083, 1086 (¶10) (Miss. Ct. App. 2011) (quoting *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000)). "Where substantial credible evidence supports a chancellor's findings, we decline to reverse unless the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Id.* (internal quotation marks omitted) (quoting *Branch v. Branch*, 174 So. 3d 932, 937 (¶9) (Miss. Ct. App. 2015)).

DISCUSSION

I.     **The chancellor did not err by awarding Spears sole legal custody.**

¶31. Moreland argues that the chancellor erred by awarding Spears full legal custody of

12

L.M. because there were no material changes in circumstances.

¶32. "Mississippi utilizes a three-prong test to determine whether custody modification is warranted." *Hammons v. Hammons*, 289 So. 3d 1214, 1218 (¶16) (Miss. Ct. App. 2020). First, there must be a material change in circumstances of the custodial parent that has arisen after entry of the first custody order. *Id.* Second, the moving party must prove that the change in circumstances has an adverse effect on the minor child. *Id.* at (¶17). Third, the modification must be in the minor child's best interest. *Id.* at (¶18). This determination "is based on an application of the *Albright* factors to the facts of the case." *Id.* at 1219 (¶18). The chancellor must consider the totality of the circumstances in each case to determine whether a material change in circumstances occurred. *Creel v. Cornacchione*, 831 So. 2d 1179, 1183 (¶15) (Miss. Ct. App. 2002) (citing *Ash v. Ash*, 622 So. 2d 1264, 1266 (Miss. 1993)). "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005.

¶33. In his appellate brief, Moreland takes issue with the chancellor's findings that: (1) his work schedule had decreased, (2) there had been a deterioration of the parties' ability to cooperate, and (3) he socially isolated L.M. He argues that there was no evidence that these three findings constituted a material change in circumstances. He further argues that there was no evidence to show that these circumstances adversely affected L.M. In focusing on these three findings, Moreland overlooks the majority of the chancellor's opinion. The chancellor stated:

> As discussed at length above[,] Mr. Moreland's behaviors are having a
> negative impact on [L.M.] and . . . her best interests will be served by

13

> modifying custody. The problem is two fold. Mr. Moreland is getting worse[,] not better. . . . At the same time, [L.M.] is growing up. She is more aware of her father's behavioral issues and is hurt and damaged by his actions toward her. There is a tipping point now where drastic action is needed to protect [L.M.] and hopefully heal the relationship.

The chancellor explained that Moreland's behavior, coupled with L.M. growing older and becoming more aware of what was happening, was the basis for his conclusion that there had been a material change in circumstances. The other three issues discussed—the ones Moreland focuses his brief on—were additional findings. Although Moreland fails to address the main basis for the chancellor's conclusion, we will address his arguments.

¶34. First, Moreland argues that the chancellor erred by finding a decrease in his work. Moreland claims that there was no evidence that supported a finding that it constituted a material change in circumstances, and that the basis for this finding was the chancellor's disappointment with the amount of his financial support. The chancellor pointed to the fact that Moreland had not worked at all as of June of that year, that he had stopped investing and working towards ownership of his family farm, and that he was evasive when questioned about how much he intended to work that year. It troubled the chancellor that Moreland blamed his lack of work on the litigation instead of providing a legitimate justification. While there may not be enough evidence in this issue alone to justify a finding of a material change in circumstances, we find nothing wrong with the chancellor using this point as justification in his totality-of-the-circumstances analysis.

¶35. Next, Moreland claims that the chancellor erred by finding a deterioration in his cooperation with Spears. The chancellor stated that the cooperation between the parties had

14

gotten worse, as evidenced by the many disagreements the two had over L.M. Moreland argues that this was not a proper reason to justify custody modification, citing several cases that support his position. *See Lipsey v. Lipsey*, 755 So. 2d 564, 567 (¶9) (Miss. Ct. App. 2000) (holding that "this Court does not find lack of cooperation [between the parents] to be a pinnacle that warrants a reconsideration of custody"); *Butler v. Butler*, 218 So. 3d 759, 763 (¶12) (Miss. Ct. App. 2017) ("This Court has never held that the mere inability of divorced parents to cooperate with one another constitutes a material change in circumstances.").

¶36. While Moreland is correct that lack of cooperation alone is insufficient to merit custody modification, it can be part of a collective basis to find a material change in circumstances. In *Lipsey*, 755 So. 2d at 566 (¶7), the lack of cooperation between the parents was the only reason that the chancellor found a material change in circumstances. Likewise, in *Butler*, 218 So. 3d at 762-63 (¶12), the only argued basis for custody modification was the lack of cooperation between the parties. Neither of these cases suggest that cooperation between the parties cannot be a reason for finding a material change in circumstances has occurred—only that it cannot be the **sole** reason. Accordingly, we do not find that it was manifest error for the chancellor in our present case to have used it for justification in his judgment.

¶37. Last, Moreland claims that the chancellor erred by finding he was socially isolating L.M. He argues that he had the right to spend time with his daughter as he pleased, given that he had limited time with her. Moreland cites several cases that suggest as much. He further points to the occasions when he had taken L.M. on vacations, visited his family with

15

her, and driven L.M. to her scheduled activities. While Moreland argues there was no evidence to support the chancellor's finding that L.M. had been socially isolated, we disagree. The chancellor pointed to the fact that Moreland had never allowed L.M. to have a slumber party at his home. Moreland only allowed L.M. to attend these types of social events if Spears switched visitation weekends with him, often only after providing a month's notice. Though Moreland's visitation time during the year was limited, he was granted substantial time with L.M. over the summers.

¶38. Again, Moreland's argument may hold more weight if the chancellor's finding was based solely on this single basis. However, the chancellor is called to look at the totality of the circumstances. The chancellor is also charged with safeguarding a child's best interest and welfare. *Albright*, 473 So. 2d at 1005. Moreland fails to address the chancellor's main basis for his findings. Moreland argues instead that the chancellor lacked substantial evidence on which to support his findings focusing on each in isolation.

¶39. Throughout his brief, Moreland claims that there was insufficient evidence to show L.M. suffered any adverse effects. The court heard from multiple individuals who witnessed adverse changes in L.M.'s behavior first-hand. L.M.'s teachers described L.M.'s bouts of crying and acting withdrawn after visitation with Moreland. Dill testified that L.M. turned in a note that stated: "[She's] grateful that [her] dad is abusive because it makes [her] stronger." Principal Cotton noted a negative change in L.M.'s eating habits, which included L.M. refusing to eat any food at lunch. Spears testified that L.M. would ask to sleep in her bed with her on the nights before and after visitation with Moreland.

16

¶40. L.M. explained her feelings of stress and anxiety surrounding Moreland's behaviors, rituals and driving. The court also heard expert testimony from Dr. Brawley that connected Moreland's controlling behavior to several of the negative emotions that L.M. was suffering. Dr. Brawley worried about L.M.'s mental health, testifying that L.M. was suffering from embarrassment, stress, and depression. She further testified that she did not believe Moreland was willing to change his behaviors or even take on a different perspective other than his own.

¶41. On the other side, Moreland was the only witness to testify on his behalf. He offered excuses and tried to rebut other witnesses' testimony when possible. The chancellor was unpersuaded by Moreland's promises to improve. We note that the chancellor presided over litigation between Moreland and Spears since 2012, and was therefore able to observe the change (or lack thereof) of Moreland's behavior over the years.

¶42. Even if we were to agree with Moreland's arguments, he fails to address the main issue—his worsening behavior and L.M.'s growing older—that were the basis for the court's finding that a material change in circumstances occurred. Given the substantial evidence in the record, the chancellor's findings were not manifestly wrong.[4] Therefore, we affirm the chancellor's decision to award Spears full legal custody.

## II. The chancellor did not err by restricting visitation.

¶43. Moreland claims that the chancellor erred by modifying visitation, or in the

---

[4] The final prong in the test asks whether the modification was in the best interest of the minor child. On appeal, Moreland does not challenge this aspect of the chancellor's analysis.

17

alternative, that the chancellor erred by over-restricting visitation. Moreland contends that there was insufficient evidence to support modification and the restrictions.

¶44. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon." *Branch*, 174 So. 3d at 939 (¶21) (quoting *Fountain v. Fountain*, 877 So. 2d 474, 481 (¶26) (Miss. Ct. App. 2003)). The general rule is that barring extraordinary circumstances, non-custodial parents are entitled to "broad authority and discretion" with respect to the place and manner of their visitation, including a presumption of reasonable overnight visitation. *Cox v. Moulds*, 490 So. 2d 866, 870 (Miss. 1986). "[T]here must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction." *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994) (citing *Dunn v. Dunn*, 609 So. 2d 1277, 1286 (Miss. 1983)).

¶45. The chancellor restricted Moreland's visitation as follows:

All daytime visitation awarded Mr. Moreland shall be unsupervised. All overnight visitation shall be supervised by Mr. Moreland's mother or another member of his immediate family.

Beginning upon entry of this order until Christmas 2020, Mr. Moreland shall exercise no overnight visitation. Visitation during this initial period will be the first Saturday of the month from 10:00 a.m. until 6:00 p.m. In addition, there will also be two Sunday afternoon visits per month on the second and [fourth] Sunday from 2:00 p.m. until 7:00 p.m.

The first overnight visitation will be during Christmas of 2020. During Christmas of every year Mr. Moreland shall visit with [L.M.] at 2:00 p.m. and ending the next day at 2:00 p.m.

Beginning in January of 2021, Mr. Moreland will have overnight visits with [L.M.] on the first Saturday of each month from 2:00 p.m. until Sunday at 2:00

18

p.m. In addition he will continue his Sunday daytime visits on the second and fourth Sunday from 2:00 p.m. until 7:00 p.m., and he will visit with [L.M.] on Tuesday of each week from 5:00 p.m. until 8:00 p.m.

While Moreland's visitation was certainly restricted, substantial evidence supported the chancellor's decision to limit overnight visitation. Each of the witnesses who worked at L.M.'s school testified about L.M.'s abnormal behavior before and after her overnight visitations. L.M.'s crying bouts and periods of acting withdrawn were later characterized as problematic by Dr. Brawley. Furthermore, Dr. Brawley testified that stopping overnight visitation would be beneficial, as the high-stress moments for L.M. and Moreland were mainly focused around meals and transportation. The revised visitation schedule reduced the amount of meals Moreland would be required to provide for L.M., while also limiting Moreland's obligations to drive L.M. under time constraints. Moreland argues that L.M. was in no actual danger, yet the aggressive driving by Moreland had certainly placed L.M. at risk of harm. Furthermore, Moreland presented no evidence to rebut Dr. Brawley's expert testimony that L.M. was suffering serious emotional harm. Because we find that there was substantial evidence supporting the chancellor's decision, we find that this issue is without merit.

### III. The chancellor did not err by finding Spears was not in contempt and declining to award Moreland attorney's fees.

¶46. Finally, Moreland claims that the chancery court erred by finding that Spears was not in contempt. He also claims that the chancery court erred by denying his request for attorney's fees.

¶47. "A citation for contempt is proper where a party has willfully and deliberately ignored

19

the order of the court." *Savell v. Manning*, 325 So. 3d 1208, 1218 (¶35) (Miss. Ct. App. 2021) (quoting *Jones v. Bryant*, 160 So. 3d 724, 727 (¶13) (Miss. Ct. App. 2015)). "We review civil-contempt decisions for manifest error." *Jones v. Mayo*, 53 So. 3d 832, 838 (¶21) (Miss. Ct. App. 2011) (citing *Dennis v. Dennis*, 824 So. 2d 604, 608 (¶¶7-8) (Miss. 2002)). "We review the denial of attorneys's fees for abuse of discretion." *Id.*

¶48.    Moreland argues on appeal that Spears should have been held in contempt because she withheld visitation from him during March 2020. Spears admitted to doing so during the hearing. She said her decision arose based on Moreland's reaction to the discovery that L.M. was secretly recording him. Moreland was upset at L.M. for the recording, and L.M. was allegedly afraid to see Moreland during that time.

¶49.    Generally, a contempt inquiry is limited to whether the order was violated, whether the order was possible to carry out, and if there is a violation, whether the violation was an intentional and willful refusal to abide by the court order. *Savell*, 325 So. 3d at 1220 (¶42). "The only defenses to a contempt violation include an inability to comply with the court order or that the court order was unclear." *Id.* However, "[w]hether a party is in contempt is a question of fact to be decided on a case-by-case basis." *Id.* at (¶43) (quoting *Gilliland v. Gilliland*, 984 So. 2d 364, 370 (¶19) (Miss. Ct. App. 2008)). In addition, the chancellor has "substantial discretion" when deciding contempt matters. *Gilliland*, 984 So. 2d at 369-70 (¶19).

¶50.    In this case, Spears admitted to withholding Moreland's visitation during March 2020. She testified that she tried to set up alternative times for Moreland to see L.M. but Moreland

refused. In most cases, this type of unilateral modification of visitation is unacceptable. It is not a defense that the party's intent was based upon pure moral sentiment. *Savell*, 325 So. 3d at 1220 (¶42). Moreland asserts that Spears should have filed an emergency motion and obtained an interim modification. However, the circumstances in this case are unusual.

¶51. In March 2020, the COVID-19 pandemic shut down this country and much of the world. Everyone, including the Mississippi court system, was trying to adapt to a new normal. At oral argument, Spears' attorney stated that she advised Spears not to file an emergency motion at that time due to the backup at the court and since the trial date was set for June 1, 2020.[5] While Moreland did not receive his scheduled visitation with L.M., he did have telephonic visitation while the stay-at-home order was still active, and he was able to see her occasionally before the hearing.

¶52. Given the totality of the circumstances in this case, we find that the chancellor did not abuse his discretion by failing to find Spears in contempt. Therefore, we affirm the chancellor's decision to deny Moreland's contempt claim. Because the request for attorney's fees was directly related to the contempt claim, we affirm the chancellor's decision to not award attorney's fees.

## CONCLUSION

[5] This Court has held that "[a]cting on the advice of counsel does not excuse a person from following an order, but it may be considered in determining whether there was willful contempt." *Price v. Snowden*, 187 So. 3d 159, 165 (¶22) (Miss. Ct. App. 2015) (citing *Cossitt v. Cossitt*, 975 So. 2d 274, 279 (¶23) (Miss. Ct. App. 2008)); *see also McKnight v. Jenkins*, 155 So. 3d 730, 732 (¶7) (Miss. 2013) ("[A] party's reliance on its counsel's advice is sufficient to make a party's violation not willful or deliberate."); *R.K. v. J.K.*, 946 So. 2d 764, 778 (¶42) (Miss. 2007) (finding no manifest error in the chancellor's determination that a party was not in contempt when he acted in accordance with his attorney's advice).

21

¶53. The chancellor did not commit manifest error in awarding Spears sole legal custody or modifying Moreland's visitation. Given the totality of the circumstances, we find that the chancellor did not abuse his discretion in declining to find Spears in contempt or award Moreland attorney's fees. Accordingly, we affirm the judgment of the chancery court.

¶54. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**